469 So.2d 1262 (1985)
STATE FARM FIRE & CASUALTY COMPANY, INC.
v.
Joe A. PONDER & Seretha K. Ponder.
83-55.
Supreme Court of Alabama.
February 15, 1985.
Rehearing Denied April 5, 1985.
Ralph Gaines, Jr., Talladega, for appellant.
Charles L. Parks, Anniston, and Betty C. Love, Talladega, for appellees.
PER CURIAM.
This is an appeal by Defendant, State Farm Fire & Casualty Company, Inc. (State Farm), from a judgment based on a jury verdict in favor of Plaintiffs, Joe A. and Seretha K. Ponder, in their action for breach of contract and fraud.

Facts and Contentions of the Parties
On August 8, 1980, State Farm issued a homeowners policy on the dwelling of Plaintiffs, Joe and Seretha Ponder, in the amount of $70,000. During the thirteen-month interval to the date of the loss, the policy coverage increased to $74,430 on the dwelling and $40,810 on the contents. On September 19, 1981, the house and its contents were totally destroyed by a fire.
The policy provided the following:
"3. Loss Settlement. Covered property losses are settled as follows:
"....
"c. Buildings under Coverage A at replacement cost without deduction for depreciation, subject to the following:

*1263 "(1) We will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts:
"(a) the limit of liability under this policy applying to the building;
"(b) the replacement cost of that part of the building damaged for equivalent construction and use on the same premises; or
"(c) the amount actually and necessarily spent to repair or replace the damaged building.
"(2) We will pay the actual cash value of the damage until actual repair or replacement is completed.
"(3) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis and then make claim within 180 days after loss for any additional liability on a replacement cost basis."
A dispute arose between the Ponders and State Farm regarding the insurer's obligations under the policy, and this action ensued. Although the Ponders' original action included multiple claims against multiple defendants, the verdict rendered for Plaintiffs was against State Farm only on the breach of contract claim in the amount of $25,000. State Farm's post-trial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, was denied.
The principal question in this case deals with the amount of money actually paid to the policyholders contrasted with the amount due from the company.
According to the evidence, State Farm's adjuster visited the scene of the fire on September 20, 1981, and paid the Plaintiffs $1,000 toward additional living expenses. Later, on October 27, 1981, Plaintiffs were paid another $1,000 additional living expenses, and on November 24, 1981, the adjuster paid an additional $5,000 as living expenses. According to State Farm, these amounts were coded and credited to "contents loss," since the Plaintiffs had no receipts, as required by the policies, for additional living expenses at the time of payment.
State Farm obtained an estimate of the cost of replacement from a contractor, one Frank Shaddix, in the amount of $58,444.84. On December 15, 1981, the Plaintiffs were paid $61,680.77 for the dwelling loss. This figure included the Shaddix bid, debris removal, and damage and destruction to trees and shrubbery. On that same day, they were paid $21,450.45 for loss to their contents. This payment made the total contents loss paid the sum of $28,450.45. On three separate dates, Plaintiffs were paid a total of $4,253.22 under Coverage CAdditional Living Expenses.
The evidence discloses that Joe Ponder rejected the bid from Shaddix, the contractor, saying, "I told [the claims superintendent] flat out that Shaddix was not building my house back. If anybody built the house back, it would be me." Joe Ponder obtained estimates from a Mr. Hammonds and a Mr. Byrdboth estimates were higher than the Shaddix bid. He said, however, that neither of them was going to build the house, because he was going to build it back himself. He also testified that the claims adjuster told him that if "you build that house back and you spend more money than the $58,444.84 that we paid you, and you presented bills to him, that he would give it consideration to see what would be done."
The Ponders began to rebuild their house. At the time of trial, they were living in it and had spent approximately $30,000. Joe Ponder testified he could finish the house for about $15,000, and that, "I was also told if the house I am currently building costs more to build than they had paid me, that at that time he would reevaluate my case and there was a possibility of extending ... coverage to us for the full max of the policy."
It is State Farm's contention that Plaintiffs accepted payment from State Farm in the sum of $61,680.77 on the house loss. It contends that the payment accepted by Ponder was $15,000 more than Ponder himself *1264 testified he had spent and would spend in replacing the house.
State Farm cites the policy's provisions, Section 1, "Conditions," 3c.(1)(c):
"c. Buildings under Coverage A at replacement cost without deduction for depreciation, subject to the following:
"(1) We will pay the cost of ... replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts:
"(c) The amount actually and necessarily spent to repair or replace the damaged building."
It is State Farm's contention that the only reasonable and logical interpretation to be placed on these policy provisions is that replacement is anticipated. State Farm contends that Joe Ponder did, in fact, replace the house, and that he was entitled under the policy to be paid the replacement cost, which by his own testimony was approximately $45,000$30,000 of which he had already spent and $15,000 more than he needed to complete the building. According to State Farm, he was actually paid $61,680.77, or $16,680.77 more than the amount at which he established the replacement cost.
State Farm, citing Commercial Union Ins. Co. v. Ryals, 355 So.2d 684 (Ala.1978), and Reliance Ins. Co. v. Substation Products Corporation, 404 So.2d 598 (Ala. 1981), maintains that the Ponders never proved any actual cash value, although there was testimony as to replacement cost, and that they were paid more than the replacement cost specified by them.
The Plaintiffs' position is directly contrary to that of Defendant. Plaintiffs state that the only controversy presented to the jury was based on the payments under Coverage A for loss of the dwelling and on the payments under Coverage B for loss of contents. They do not dispute either the $58,444.84 sum paid under Coverage A or the $28,450.45 sum paid under Coverage B. According to Plaintiffs, the total sum in controversy is the difference between the amounts claimed under Coverages A and B (totaling $114,743.30) and the amounts paid thereunder (totaling $86,895.29), that sum being $27,848.01.
Plaintiffs contend that under the terms of the insurance policy they were entitled to recover the actual cash value of the house which was destroyed and the actual cash value of the destroyed contents. In other words, Plaintiffs say that they had the option of disregarding replacement costs in making their claim for a loss under Coverage A, the house. They maintain that after the total destruction by the fire they began construction of another house by utilizing the $58,444.84, which State Farm had paid them under Coverage A. Moreover, they say that at the time of the trial they had spent $30,000 constructing the house and had not completed it. Plaintiffs argue that notwithstanding the conditions under paragraph 3c.(1) of the policy, the explicit language of paragraph 3c.(3) repudiates the insurer's contention. This provision is as follows:
"You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis and then make claim within 180 days after loss for any additional liability on a replacement cost basis."
According to Plaintiffs, this paragraph expressly permits them to disregard the very section in the policy on which the Defendant relies and to make their claim under Coverage A on an actual cash value basis. In other words, the Plaintiffs say that this provision applies where an insured wishes to convert his loss to cash and spend substantially less money in the construction of another dwelling.
Moreover, Plaintiffs say there was an abundance of testimony at the trial from which the jury could establish the actual cash value of the house at the time of the loss. Plaintiffs say the house which was destroyed contained 3,056 square feet and was built by Plaintiff Joe Ponder, utilizing the highest quality materials. Ponder testified that when construction was completed in July of 1980 he had spent approximately *1265 $70,000 on the structure. Defendant insured the premises under a homeowners policy on August 8, 1980, in the sum of $70,000. During the next 13 months, the face value of the policy increased to $74,430, and 13 months after the policy was issued the house and its contents were totally destroyed by fire.
The court admitted into evidence during the trial two itemized estimates which established the cost of replacing the house as being in excess of $80,000. The Plaintiffs maintain that the evidence was such that the jury could reasonably have concluded that the house had appreciated due to inflation faster than it had depreciated due to age and that the actual cash value of the Plaintiffs' house at the time of the loss was equal to or in excess of the $74,430 face value of the policy. Hence, according to Plaintiffs, an award under Coverage A of the policy of up to the $15,986 difference between the face value under Coverage A and the amount actually paid by Defendant under Coverage A can be sustained as an award of the actual cash value of Plaintiffs' loss under Section 1, "Conditions," 3c.(3).
Plaintiffs also contend that, although they were entitled to the actual cash value of the destroyed contents under Coverage B, the jury rejected both the amount claimed ($40,313.30) and the amount paid ($28,450.45). In fact, say the Plaintiffs, the jury, allowing a nominal depreciation, fixed the award for the destroyed contents at an additional amount of $9,014.00; and this sum, when added to the $15,986.00 difference due under Coverage A, totals the verdict award of $25,000.

Issues Presented
Three issues are presented:
I. Did the trial court err in denying Defendant's motion for directed verdict on the contract action?
II. Did the trial court err in overruling Defendant's objection to admission into evidence of the statement under oath taken of Plaintiff Joe Ponder as provided in the insurance policy?
III. Did the trial court err in refusing to grant Defendant's motion for mistrial after counsel for Plaintiffs, on ten different occasions, made inflammatory and prejudicial statements to the jury in closing argument, to which objections were sustained?

Decision

1. The Directed Verdict Issue
Citing Huggins v. Hanover Ins. Co., 423 So.2d 147 (Ala.1982), the insurer summarizes its position thusly:
"The only reasonable and logical interpretation to be placed on these policy provisions is that replacement is anticipated. Plaintiff Ponder did in fact replace the house. He was entitled to be paid the replacement cost which, by his own testimony, approximated $45,000.00 $30,000.00 already spent and $15,000.00 more to complete. He was actually paid... more than the amount at which he established the replacement cost.
"....
"... [I]f either the replacement cost or the actual amount spent is less than the policy limits, the insurance company would be responsible for that amount. If both amounts are less than the policy limits, then the lesser of those two amounts would be the amount due the homeowner. This interpretation makes sense because the reason for the insurance in the first place is to provide protection to the homeowner so that if his house has to be repaired or replaced the insurance company will pay those costs.
"Plaintiff further contends that the paragraph of the policy allowing the homeowner to disregard the replacement cost loss settlement provisions allows him to convert his loss to cash and spend substantially less money in rebuilding. The plaintiff is not locked into a replacement cost basis. He can receive actual cash value (computed by subtracting depreciaion from full replacement costs) and choose never to rebuild. If he does choose to rebuild, as he did here, then he is locked into a replacement cost basis."
*1266 The insurer's contention that once the insured elected to rebuild he was "locked into a replacement cost basis" is a misunderstanding of Huggins. Indeed, such a contention is directly contrary to the express language of the contract. When subparagraphs (2) and (3) of paragraph 3c. are read together, it is clear that the insured's right to claim actual cash value is unaffected by his choice to rebuild his house. To be sure, what is contemplated is that, ordinarily, actual cash value will be less than replacement cost; thus, the insurer will first pay the lesser amount; and then, upon completion within 180 days after the loss, will pay the difference between actual cash value and replacement cost, not to exceed the policy limits.
Any other interpretation makes a mockery of the overall coverage afforded by the policy. Under the insurer's position, if an insured replaces a $100,000 house with a $50,000 house (a hypothetical not unlike the instant case), because the replacement cost is the lesser of the two sums, he cannot recover the greater. But suppose the insured called upon the insurer to "pay the actual cash value of the damage until actual repair or replacement is completed," pursuant to paragraph 3c.(2), and the insured then rebuilds a smaller house costing $50,000.00, is he obligated to return the $50,000.00 difference? This question is self-answering; and the negative reply to that question compels our resolution of the directed verdict issue adversely to the Appellant.
Replacement cost is a relatively new addition to homeowners policies. Its coverage is provided in clear, unambiguous language. It is an additional coverage, or, perhaps, more accurately, an additional optional coverage offered the insured. If his house is destroyed, he can rebuild it, within the limits of the coverage, even though the cost may exceed the actual cash value of the insured dwelling. There is absolutely nothing in the policy language, however, that requires the insured to forfeit the actual cash value coverage if he elects to forgo the optional replacement cost. Under our hypothetical (completely analogous here), it was the insured house (five bedrooms, three baths) that suffered the loss, not the two-bedroom, two-bath house that was rebuilt.
Huggins is clearly distinguishable on its facts. There, the insurer paid the insureds the actual cash value of their destroyed home. The insureds were claiming the difference between the amount paid and the face value of the policy. The language in Huggins dealing with replacement cost was unnecessary to its holding.

2. The Evidentiary Issue
Although Appellant states this issue in terms of "admissibilty," its brief and the oral argument of counsel narrow the issue to whether the trial court erred in permitting a sworn statement, given to the insurer by Joe Ponder before suit, to be taken by the jury during its deliberations. Citing Ott v. Fox, 362 So.2d 836 (Ala.1978), Appellant contends that this sworn statement (essentially a listing of contents and the cost of each item) is analogous to a deposition, and thus should not have been permitted to go to the jury room.
Admittedly, Ott so holds with respect to depositions read into evidence. It is the substance of the deposition that is properly admissible, not the document on which it is transcribed. National States Ins. Co. v. Jones, 393 So.2d 1361 (Ala.1980). But, as Ott makes clear, where the admitted item or document is itself evidence, the policy reasons for precluding the transcribed document containing the deposition do not obtain:
"It is understood, of course, that nothing we have said in any way affects the admissibility, or the taking into the jury room, of documentary evidence (e.g., notes, insurance policies, written contracts, plats, etc.); rather, our holding is limited to the matter at issuetestimony by way of depositionthe transcription of which is not itself evidence." Ott v. Fox, 362 So.2d at 841.
The sworn statement here in question, which was not read to the jury but offered *1267 as evidence of compliance with certain policy provisions relating to a loss claim, was admissible; and the trial court did not err in sending it, along with other documentary evidence, to the jury room during the jury's deliberations.

3. Argument of Counsel
The jury argument of Plaintiffs' counsel, here complained of as improper and prejudicial, is essentially referable to the Plaintiffs' fraud claim that was submitted to the jury along with their contract claim. Because the jury rejected Plaintiffs' fraud claim, and because Appellant does not challenge the contract award as being excessive, we find no reversible error with respect to this issue.
AFFIRMED.
MADDOX, FAULKNER, JONES, ALMON, SHORES and ADAMS, JJ., concur.
TORBERT, C.J., concurs specially.
EMBRY and BEATTY, JJ., dissent.
TORBERT, Chief Justice (concurring specially).
I concur in the majority opinion. The pertinent provisions of the insurance policy at issue clearly indicate that the loss settlement provisions did not restrict the insured merely to recovery of repair or replacement cost. Subparagraph (3) of paragraph 3c. specifically states that the insured "may disregard the replacement cost loss settlement provisions." Moreover, subparagraph (3) provides that should the insured disregard replacement cost and make claim on an actual cash value basis the insured may then make claim for any additional liability on a replacement cost basis within 180 days after the loss. This language controls the disposition of this case. Thus, in accordance with the express terms of the policy, the insured was not required to base a claim for benefits on the replacement cost loss settlement provisions, but rather was entitled to disregard those provisions and make claim for the actual cash value of the loss.
BEATTY, Justice (dissenting):
In a case such as this, the language of the policy must control, and it is abundantly clear that this policy contemplates replacement. Each and every loss settlement provision concerning buildings makes reference to replacement. In issuing this policy, State Farm agreed to replace or repair the Ponders' home, should it be damaged. State Farm did not agree to act as a real estate broker and, in effect, purchase the Ponders' house at whatever value the Ponders sought to place on it. The object of an insurance policy of this type is to indemnify the homeowner in case of a loss; it is not intended to provide him with the profit he may have obtained by selling the house at its market value.
The majority states that Huggins v. Hanover Ins. Co., 423 So.2d 147 (Ala.1982), is distinguishable on its facts from the present case. However, Huggins is clearly analogous to this case. In Huggins, this Court considered the effect of policy provisions almost identical to those contained in this State Farm policy. In that case, the Hugginses acted as their own contractors in building their house. Before it was completed, it was totally destroyed by fire. Hanover had insured the house against fire loss, limiting its liability to $120,000. Huggins set out the settlement provisions of that policy:
"`c. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
"`(1) If at the time of loss the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately prior to the loss, we will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts:
"`(a) the limit of liability under this policy applying to the building;
"`(b) the replacement cost of that part of the building damaged for equivalent *1268 construction and use on the same premises; or
"`(c) the amount actually and necessarily spent to repair or replace the damaged building.'
"Part c. also provided:
"`(4) When the cost to repair or replace the damage is more than $1000 or more than 5% of the amount of insurance in this policy on the building, whichever is less, we will pay no more than the actual cash value of the damage until actual repair or replacement is completed.
"`(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis and then make claim within 180 days after loss for any additional liability on a replacement cost basis.'" 423 So.2d at 149.
About one month following the fire, the Hugginses contracted to purchase a new home at another location for $79,000. Two months later, Hanover's adjuster presented them with a breakdown of the recovery available as follows:

"Full replacement cost $106,366.21
 [Obtained from estimate of
 building contractor.]
Less applicable depreciation $21,266.21
Actual cash value loss $85,100.00
Less deductible $100.00
Actual cash value claim $85,000.00
Supplemental claim $21,266.21"

423 So.2d at 149. Hanover offered an actual cash value settlement of $85,000, which, a short time later, the Hugginses accepted.
Later, the Hugginses sued Hanover to recover an additional $34,900 under the policy, claiming the difference between the full amount of liability on the policy and the amount paid by Hanover, less the deductible. In other words:

$120,000.00 Policy Limit
- 85,000.00 Paid by Hanover
 - 100.00 Deductible
___________
$ 34,900.00 Claimed by Insured

The trial court granted a directed verdict for Hanover, and, on appeal, this Court affirmed the trial court's decision. Applying the provisions of the policy, this Court held that recovery would be the smallest of the following: (1) under c.1(a) recovery would be $120,000 (the limit of liability); (2) Under c.1(b) recovery would be $106,366.21, if the building were rebuilt on the same premises (replacement cost for equivalent construction on same premises); (3) under c.1(c) recovery would be $79,900.00, if the new home purchased by the insureds was a "replacement" for the destroyed home.
This Court added at 423 So.2d 150:
"Subparagraph c.(4) limits all replacement cost recovery under c.(1) to actual cash value until repair or replacement is complete. Subparagraph c.(5) [paragraph 3c.(3) in the policy involved in the present case] allows for an actual-cash-value recovery prior to replacement and a supplemental claim when replacement is completed.

"....
"Provisions like those contained in subparagraph c.(4) have been interpreted as providing a condition precedent to an insurer's duty to pay repair or replacement costs of an insured building. A party who has not repaired or replaced his insured building has not complied with the condition precedent to recovery under the policy and so cannot recover. See Kolls v. Aetna Casualty & Surety Co., 503 F.2d 569 (8th Cir.1974); Bourazak v. North River Insurance Company, 379 F.2d 530 (7th Cir.1967)."
The Court then found that when the Hugginses contracted to purchase their new home it became a "substitute," and thus a "replacement" under the settlement provisions.
It is significant for the purposes of the instant case that the insureds in Huggins argued that under subparagraph (5) (actual cash value before replacement), which is identical to paragraph 3c.(3) in the present case, an insured could claim loss by procuring "a competent estimate from a contractor and then us[ing] it to claim loss." This *1269 Court rejected that argument, stating at 151:
"This provision was not intended to allow for recovery of replacement cost without repair or replacement but, rather, was to allow an insured to make a claim for and to collect his actual cash value loss immediately and to make an additional claim within 180 days for costs incurred in repairing the building.
"Assuming that the new house is not a replacement, if this Court holds that the Hugginses are entitled to replacement cost despite the fact that they did not meet the condition precedent of replacement, the appellee is correct when it says:
"`[T]he result ... would mean that in many cases the actual cash value language in an insurance policy is meaningless. In a total loss, depreciation is deducted from replacement cost to determine actual cash value. Thus, actual cash value will nearly always be less than replacement costs. If the insured can recover either replacement cost or actual cash value without first having to repair or replace the damaged premises, then the actual cash value language in the policy has no scope of operation.'

Thus, if we are to give effect to the `actual cash value' language of the policy, regardless of the replacement issue, we must find that Hanover has met its obligation under the policy by paying the actual cash value to the plaintiffs." (Emphasis added.)
Thus, this Court in Huggins found that Hanover owed no additional amount.
In Huggins, the new house was a replacement, even though it was located at a different site. Here, Ponder rebuilt his house on the same site, so that it is obviously a replacement. The principles announced in Huggins should be applied to this case.
The settlement provisions of the instant policy begin with these phrases:
"3. Loss Settlement. Covered property losses are settled as follows:
"....
"c. Buildings under Coverage A at replacement cost without deduction for depreciation, subject to the following:" (Emphasis added.)
Thereafter follow the provisions which have been held to be conditions precedent to the insurer's duty to pay repair or replacement costs of an insured building.
In this case, paragraph 3c.(1), is intended to limit the insurer's liability to the maximum of the policy limits. That is, if the replacement cost exceeds the policy limits, then the policy limit is the amount the insurer is obliged to pay. On the other hand, if either the replacement cost or the actual amount spent is less than the policy limits, that amount is the company's liability. If both the replacement cost and the actual amount spent are different, then under the policy the lesser of these two amounts is the amount owed the insured.
Paragraph 3c.(3), allowing the policyholder to disregard the replacement cost loss settlement provisions and claim actual cash value, permits the policyholder to make later claim for additional liability on a replacement cost basis if he chooses to do so. Thus, if the insured did rebuild, his recovery would be made on a replacement cost basis. Huggins, supra, at 151.
Applying the settlement provisions of paragraph 3c.(1)(a) to these facts, the amount the Ponders were entitled to would be the smallest of: $74,300.00 (the limit of liability); under 3c.(1)(b), $61,680.77 (replacement cost for equivalent construction on the same premises, based upon the estimate of Frank Shaddix, a local contractor this sum includes replacement cost of $58,444.84; $1,980.00 for removal of debris; and $1,255.93 for damage to shrubbery and trees); under 3c.(1)(c), $45,000.00 actually spent to replace the building (based upon the insureds' own testimony on the actual cost$30,000.00 plus $15,000.00 to complete the building). Thus, the Ponders were entitled to the least of these three *1270 amounts, or $45,000.00.[1] They were paid $61,680.77. State Farm, therefore, has met its obligation. The Ponders' argument that they only applied for a payment under paragraph 3c.(3) for actual cash value is unavailing under these facts because "[t]his provision was not intended to allow for recovery of replacement cost without repair or replacement." Huggins at 151. When plaintiffs replaced, therefore, they came within the loss settlement provisions of paragraph 3c.(1)(a), (b), and (c).
In actuality, the Ponders have received some $16,000 more than the amount to which they were entitled. While it was certainly the Ponders' prerogative to replace the house destroyed in the fire with a less expensive dwelling, their policy does not entitle them to force State Farm to purchase their damaged house and provide them the profit they might have obtained by selling it.
It is also a curious result that those concurring in Huggins, where the language in the fire insurance policy was identical to that contained in this policy, now concur in an opposite construction of that language. The answer must be one involving prestidigitation.
I would hold that the trial court erred in denying State Farm's motion for directed verdict on the contract claim.
EMBRY, J., concurs.
NOTES
[1] Plaintiffs would not be aided if the Hammond or the Byrd estimates were used under 3c.(1)(b). Byrd's estimate, which Ponder furnished to State Farm, was $83,475.00. This figure was higher than the limit of liability, see 3c.(1)(a), and also higher than the amount the replacement actually cost, according to Ponder himself, $45,000.00.