671 So.2d 1368 (1995)
Scottie BALLARD
v.
Alan Godfrey LEE, individually and as representative of those certain underwriters at Lloyd's signatory to Policy No. 895-NAL01-118-90.
1921295.
Supreme Court of Alabama.
September 22, 1995.
Rehearing Denied December 15, 1995.
*1369 Larry W. Morris and Clay Hornsby, Alexander City, Harry Green and Wyatt Howell, Hamilton, for Appellant.
David Leonard and Gilbert M. Malm, Atlanta, Georgia, Philip H. Butler, Montgomery, for Appellee.
BUTTS, Justice.
Scottie Ballard appeals from a summary judgment entered in favor of Alan Godfrey Lee in Ballard's action against Lee and others seeking compensation for alleged insurance fraud.
In late August 1990, Scottie Ballard visited the office of the Sealy Insurance Agency ("Sealy") in Hamilton, Alabama, seeking property coverage on a restaurant that he had recently purchased. During that visit, Ballard and Sealy employees discussed the description and the value of the property and the consequent amount of coverage. Ballard requested coverage for the structure in the amount of $85,000 and coverage for its contents in the amount of $45,000, according to his estimations of their respective values. Sealy told him that it would begin searching for a company that would supply the requested coverage and that Sealy would notify him within a few days.
Sealy's initial attempts to locate an authorized insurance agency[1] that would supply the coverage were unsuccessful. Consequently, officials at Sealy contacted North Alabama Insurance, Inc. (hereinafter "NAI"), a "surplus lines insurance broker, to assist in the search."[2]Brief of Appellee, at 7. NAI contacted Frizzell International, Limited (hereinafter "Frizzell"), a London brokerage firm, which, in turn, solicited coverage from a number of independent "underwriting syndicates" doing business at Lloyd's, London. A "certain" syndicate (the "Syndicate") agreed to issue a policy after the receipt of an inspection report, an executed application form, and the installation of a specified fire protection system.
Frizzell notified NAI of the Syndicate's terms, and NAI informed Sealy. Subsequently, Sealy employee Travis Ray Carter relayed the information to Ballard, saying: "I have got your insurance and got you bound, if you want it.... It's $85,000 and $45,000." Ballard assented to these conditions *1370 and paid the premium to Sealy, which subsequently forwarded the appropriate amount to the Syndicate.
On August 22, 1990, notice of Ballard's acceptance was relayed to NAI by Carter, who telephoned Alan Mitchell, an employee of NAI. Because Carter was unable to speak personally to Mitchell, he left a message, stating: "Bind." The same day, Mitchell sent the following facsimile message: "PLS. BIND PER YOUR QUOTE EFFECTIVE 8/22/90 @ 2:45 PM." The following day, Mitchell contacted Frizzell again by facsimile, asking: "WERE YOU ABLE TO GET BOUND EFF 8/22 PER MY FAX OF SAME DATE?" To that request, Frizzell immediately responded with a facsimile message to NAI, stating, in pertinent part: "Confirm Bound 100% Lloyds Effective 22nd Aug 90."
On August 24, 1990, NAI ordered a local engineering firm to inspect the property. The inspector viewed Ballard's property on August 30, 1990, and reported his findings and recommendations to NAI, which then forwarded the report to the Syndicate. That inspection, however, was accomplished after the restaurant had closed for the day. Consequently, Mitchell ordered that a second inspection be performed during business hours. On October 2, 1990, Frizzell asked Mitchell to confirm (1) that the restaurant was "fully operational," (2) that the fire protection system had been installed, (3) that the inspector's recommendations had been implemented, and (4) that a "reinspection report" would "be forthcoming within [the] next 30 days." On October 16, 1990, Mitchell sent a facsimile message to Frizzell, confirming the implementation of Frizzell's conditions.
On October 19, 1990, the Syndicate issued a policy containing the following pertinent provisions:

"INSURING CLAUSE
"Subject to the terms, conditions and exclusions hereinafter contained, this policy insures all real and/or personal property (including improvements and betterments) of the Assured or property held by the Assured in trust or on commission or on consignment for which the Assured may be held legally liable against ALL RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE occurring during the period of this Policy as stated in the Schedule attaching to and forming part hereof, hereinafter referred to as the `Schedule'.
"....
"CONDITIONS
"1. VALUATION
"In case of loss of or damage to property insured hereunder, the basis of adjustment shall be as follows:
"....
"REPLACEMENT COST ENDORSEMENT
"....
"It is understood that in the event of loss or damage settlement shall be based upon the cost of repairing, replacing or reinstating (whichever is the least) with material of like kind and quality without deduction for depreciation, subject to the following provisions:
"(a) The repairs, replacement or reinstatement (all hereinafter referred to as `replacement') must be executed with due diligence and dispatch;
"(b) Until replacement has been effected the amount of liability under this policy in respect of loss shall be limited to the actual cash value at the time of loss;
"....
"The Underwriter liability for loss under this policy including this endorsement shall not exceed the smallest of the following amounts:
"i. the amount of the Policy applicable to the destroyed or damaged property,

*1371 "ii. the replacement cost of the property or any part thereof identical with such property and intended for the same occupancy and use,
"iii. the amount actually and necessarily expended in replacing said property or any part thereof."
(Emphasis added.)
On December 28, 1990, Ballard's restaurant was entirely destroyed by fire. Subsequently, estimates of the cost to replace the property were submitted, and GAB Business Services, Inc. (hereinafter "GAB"), was engaged to adjust the claim. Based on the lowest cost estimate, GAB calculated the "actual cash value" of the building to be $52,870 and the "actual cash value" of the contents to be $27,475.33. These computations included deductions in the amounts of $32,130 for depreciation of the building and $24,862.51 for depreciation of the contents.
On March 12, 1991, Frizzell issued to Ballard checks in the amounts of $52,870 and $27,475.33 for the loss of the building and the contents, respectively. With these funds, Ballard retired a $65,000 mortgage on the property and paid off other, unrelated debts. Ballard did, however, protest the shortfall of $56,992.51 from the policy limits. The Syndicate defended its method of payment, contending that Ballard's right to recover the face amount of the policy was contingent upon his reconstruction of the building. Ballard's efforts to obtain a loan for reconstruction failed, partly because the Syndicate refused to serve as a surety on any obligation for that purpose. Ballard subsequently used the restaurant location as collateral for a $10,000 loan, the proceeds of which he also spent on nonrestaurant debts. Eventually, Ballard lost the property when he defaulted on his repayment of the $10,000 note and the mortgagee foreclosed.
On February 4, 1992, Ballard sued the Syndicate and NAI. Counts One and Two of his two-count complaint alleged breach of contract and bad faith, respectively. On April 28, 1992, Ballard amended his complaint to add as defendants Sealy, Carter, "and Alan Godfrey Lee, individually and as representative of those certain Underwriters at Lloyd's Signatory To Policy No. 895-NAL01-118-90" (likewise hereinafter referred to as the "Syndicate"). Also, the amended complaint contained a third count, basically alleging that the Syndicate had fraudulently suppressed the "actual cash value" method by which it limited the amount of benefits that Ballard could obtain under the policy.
The same day, the Syndicate moved the trial court to dismiss the counts contained in the original complaint. Ballard did not respond to that motion, and, on February 12, 1993, the trial court granted the Syndicate's motion with prejudice. On March 16, 1993, the Syndicate moved for a summary judgment on count three, as contained in the amended complaint. The parties argued this motion before the trial judge on April 9, 1993. On April 15, 1993, the trial court entered a summary judgment in favor of the Syndicate, and certified the judgment as a final judgment, pursuant to Ala.R.Civ.P. 54(b). From that judgment, Ballard appealed.
Ballard advances two theories as bases for his fraud claim. The first theory is based on allegations that Carter, as an agent of the Syndicate, misrepresented or suppressed material facts. The second theory is based on allegations that the policy, itself, fraudulently suppressed material facts.

I. Agency
Ballard contends that Carter was the agent of the Syndicate, or, at least, that he concurrently represented the Syndicate and Ballard. The Syndicate denies that Carter was an agent of the Syndicate, contending that he was merely a broker representing Ballard in Ballard's search for coverage.
The functions and characteristics of insurance "agents" and "brokers," respectively, are set forth in Ala.Code 1975, § 27-7-1(a). That section defines those two terms: "(1) Agent. A natural person, partnership or corporation appointed by an insurer *1372 to solicit and negotiate insurance contracts on its behalf, and if authorized to do so by the insurer, to effectuate, issue and countersign such contracts. An agent may not delegate the countersignature authority by appointing another person as his attorney-in-fact, except, that this provision shall not apply to agents for direct-writing insurers.
"(2) Broker. A natural person, partnership or corporation who, on behalf of the insured, for compensation as an independent contractor, for commission or fee and not being an agent of the insurer, solicits, negotiates or procures insurance or the renewal or continuance thereof, or in any manner aids therein, for insureds or prospective insureds other than himself or itself. Brokers cannot bind the insurer and all business produced must be countersigned by a resident agent of the insurer accepting the risk."
(Emphasis added.) See, also, J. Appleman, Insurance Law and Practice § 8726, at 338 (1981) ("A broker is ... one who acts as a middleman between the insured and insurer and ... solicits insurance from the public under no employment from any special company").
In this case, it is undisputed that Carter and the Syndicate shared no express contractual relationship. Indeed, Ballard concedes that liability cannot be based on the principle of respondeat superior. Brief of Appellant, at 56. After assuming the responsibility, at Ballard's request, to locate an insurer, Carter served at all relevant times as a "middleman" for the transactions between the Syndicate and Ballard. Moreover, no reasonable construction of the communications transpiring among the parties supports the proposition that Carter had either actual or apparent authority to bind the Syndicate. Thus, we are compelled to conclude that Carter's role throughout these transactions was that of a broker.
Ordinarily, "an insurance broker represents the insured and is not considered an agent of the insurer." Lampkin v. Kelly, 771 S.W.2d 953, 954 (Mo.App.1989). A broker usually acts solely as the insured's agent and "has a license to `hunt' for a suitable policy without having any prior representation contract with any particular insurer." M. Pock, Insurance, 45 Mercer L.Rev. 253, 255 n. 15 (1993); see, also, J. Appleman, Insurance Law and Practice § 8727 (1981). Only "special conditions or circumstances in a particular case [will] warrant the inference that a broker is the agent of the insurer." Lampkin, 771 S.W.2d at 954. These rules are essentially codified in Ala.Code 1975, § 27-7-1(a)(2), which expresses the intent of our legislature with regard to concurrent agency, namely, that in the usual case, a broker will not be regarded as "an agent of the insurer." Id.
We are aware that a broker sometimes performs certain functions that benefit the insurer, such as delivering the insurer's policy to the insured, collecting premiums from the insured, and forwarding the proceeds of the premium to the insurer and, thus, that the broker may, for some purposes, represent the insurer. Hunt v. State, 737 S.W.2d 4 (Tex.App.1987); see, also, American Fire Ins. Co. v. King Lumber & Mfg. Co., 74 Fla. 130, 77 So. 168 (1917), affirmed, 250 U.S. 2, 39 S.Ct. 431, 63 L.Ed. 810 (1919). In § 27-7-1(a)(2), however, these activities are expressly, or by clear implication, ascribed to brokers. Thus, the broad application of this rule in Alabama would render anyone who "solicits, negotiates or procures insurance or the renewal or continuance thereof, or in any manner aids therein, for insureds or prospective insureds," § 27-7-1(a)(2) (emphasis added) by which activities he qualifies as a broker ipso facto an agent of the insurer. Such a result would contravene § 27-7-1(a)(2) and would be contrary to the policy of this state as declared by the legislature. Thus, where, in a damages action alleging fraud, a defendant insurer files a properly supported summary judgment motion, suggesting that the person who allegedly defrauded the plaintiff insured was a brokerwhich the plaintiff contends was a dual agentthe plaintiff's *1373 rebuttal evidence must relate to activities of the broker other than those mentioned in § 27-7-1(a)(2).
The only evidence presented indicating Carter's activities, other than his delivering the policy and receiving the premium, related to his assisting Ballard in obtaining a satisfactory inspection report. Because insurance involves an ordinary contractual relationship, the "insurer my impose any terms and conditions consistent with public policy which it may see fit." J. Appleman, Insurance Law and Practice § 7004, at 39 (1981). The Syndicate was entitled to require an inspection report as a condition precedent to its obligation to issue a policy, and Carter's assistance to Ballard in the procurement of a report satisfactory to the Syndicate was merely an "aid" in the procurement of coverage, as provided by § 27-7-1(a)(2). Thus, we conclude that Ballard's evidence indicating that Carter was the Syndicate's agent, on which evidence Ballard sought to base the Syndicate's principal-and-agent liability, was insufficient to defeat the Syndicate's properly supported motion as to the claim of principal-agent liability. Thus, the summary judgment is affirmed as to that claim.

II. Policy Fraud
Ballard next argues that, through the policy it issued to him, the Syndicate suppressed material facts that it had a duty to disclose, concerning the amount of benefits that the Syndicate would pay in the event of a total loss on the property.
The alleged fraud arises from subparagraph (b) of the "Replacement Cost Endorsement," which states, in pertinent part: "Until replacement has been effected the amount of liability under this policy in respect of loss shall be limited to the actual cash value at the time of loss" (emphasis added). With this provision, the Syndicate limited the benefits Ballard could receive, before the property was replaced, to the actual cash value as it was assessed by the Syndicate's own calculations. The record shows that the definition of "actual cash value" was replacement cost, or $85,000, minus depreciation on the building. Under its own method of calculating the amount of this depreciation, the Syndicate devalued the building by 37.8% and its contents by 55.2% after only four months.
Ballard argues that the Syndicate's insurance policy is fraudulent upon its face, because it does not disclose that the definition of "actual cash value" is the replacement cost less depreciation, and does not disclose the method by which the company would calculate the actual cash value of the property in the event of a total loss.
The Syndicate points out that this Court has consistently upheld the validity and enforceability of replacement policy provisions that allow the insurer to pay only the actual cash value of property, and to withhold full replacement cost, until the replacement is completed to the insurer's specification. See Hilley v. Allstate Insurance Co., 562 So.2d 184 (Ala.1990) (breach of contract and bad faith claims rejected where replacement cost provisions were found valid and enforceable); Huggins v. Hanover Insurance Co., 423 So.2d 147 (Ala.1982) (terms of replacement provision upheld as valid condition precedent to receiving full replacement cost); State Farm Fire & Cas. Co. v. Ponder, 469 So.2d 1262 (Ala.1985). Here, however, Ballard does not question the general validity and enforceability of this type of provision in a replacement policy, when the meaning of the provision is known to the insured. Rather, Ballard argues that, under the facts of this case, it was fraudulent for the Syndicate not to inform him, within the written policy, of how the provision would limit the benefits that would be paid to him in the event of a total loss.
To establish a claim of suppression under Ala.Code 1975, § 6-5-102, the plaintiff must establish that there was a suppression of a material fact, which the defendant was under a duty to communicate either because of a confidential relationship or because of the particular circumstances of the case. The question of the existence of a duty to disclose a material fact is for the jury to *1374 resolve, and in reaching that question the jury should consider the relationship of the parties, the value of the particular fact suppressed, and the relative knowledge of each party. Baker v. Bennett, 603 So.2d 928 (Ala. 1992), cert. denied, 507 U.S. 912, 113 S.Ct. 1260, 122 L.Ed.2d 658 (1993).
Ballard does not claim that he had a confidential relationship with the Syndicate, nor do we find one. On the contrary, as a surplus lines insurer, the Syndicate is far removed from an individual insured, and its only link to Ballard within the web of brokers and insurance procurers between them was the written policy itself. The policy states that, until the property is replaced, the Syndicate will pay only the "actual cash value" of the property. The policy does not, however, reveal the meaning of the term "actual cash value."
At the summary judgment hearing, Ballard testified that he interpreted the term "actual cash value" to simply mean the amount of money that the property could reasonably be sold for in the marketplace. Travis Ray Carter, as a 41-year veteran of the insurance business, testified that the everyday interpretation of "actual cash value" would suggest the amount of money that Ballard's property was worth when it burned. William Payne, president of Sealy Insurance Agency, Inc., with 25 years' experience in the insurance industry, testified that the everyday meaning of the term was "fair market value," but he emphasized that the insurance industry defines the term "actual cash value" differently from the way laypeople define it. He also stated that he knew of no way that a policyholder would know that the insurance industry interpreted the term differently, unless it was defined in the policy.
Nelson Gribble, president of North Alabama Insurance, Inc., testified that when an insurance company is assessing the value of a property in order to determine how much it can be insured for, it commissions a valuation report to determine the "actual cash value" based on "fair market value, allowing for depreciation." In utilizing this "everyday" method of computing "actual cash value" before issuing coverage, the Syndicate depreciated the property by only $22,400, or 20%, and assigned it a value of $89,600. After the fire, only four months later, the Syndicate utilized the "industry" method of calculating "actual cash value"; the Syndicate depreciated the property by another $32,130, or 37.8%, deducted this amount from the policy limits and valued the building at $52,870.
James Allen Mitchell, the NAI broker who handled the acquisition of Ballard's policy, testified that in ordinary usage "actual cash value" is a "fairly common-sense term meaning a fairly common-sense thing; it means the value of something, whatever that something happens to be, for cash." He then added that, in insurance jargon, it means "replacement cost minus depreciation." Simon White, a London-based "claims settler" who handles the claims of Lloyd's, London, testified that the term is defined within the industry as "replacement cost, less an allowance for depreciation, wear and tear," and that this definition was "universal" in the settling of insurance claims. White stated that he learned this fact by his experience in the insurance industry. Peter Lenhart, the claims adjuster who calculated the loss on the property, testified that "actual cash value" is an "insurance term" that he learned through "correspondence courses, through education center training, through the ... Insurance Institute of America, [and] all the classes and knowledge that I received over my career."
The evidence establishes that the sole communication between Ballard and the Syndicate was the written replacement policy. As the Syndicate states in its brief, coverage through the non-standard, surplus lines insurance market is unusual and can be complex, and Alabama law does require that there be surplus lines brokers to act on behalf of the insured. Ala.Code 1975, § 27-10-25; § 27-7-1(a)(2). We nonetheless point out that, where a written policy is the only communication from a remote insurer, the written meaning of the policy's terms takes on a heightened significance to the insured, who must abide by them.
*1375 The evidence shows that the Syndicate employed the term "actual cash value" as a tool of its trade to sharply limit the benefits Ballard could receive after a total loss, without defining the "industry" term within the policy. The evidence also shows that the term "actual cash value" has an accepted everyday meaning, which would be known by a layperson, and that its meaning for purposes of a replacement policy is generally known only to those in the insurance industry. Because Ballard has thus established his suppression claim with substantial evidence concerning the relationship of the parties, the value of the fact suppressed, and the relative knowledge of each party, the claim must be presented to the jury.
We do not today disturb that line of cases wherein we have upheld the validity and enforceability of "actual cash loss" provisions in replacement policies. We again note that replacement of the insured property is a legitimate condition precedent to receiving the full replacement cost. See Huggins v. Hanover, supra. We also recognize that foreign insurers who issue surplus lines policies through a system of brokers and underwriters do this for profit. We emphasize, however, that when consumers generate this profit for an insurer whose only link to them is a written policy, they are entitled to read in that policy the basic facts about the coverage they are paying for. This is a particularly compelling point where a material term in the policy is not given its ordinary meaning, but is instead treated as a term of art and its specialized meaning is kept from the insured, who will obtain and pay for coverage in ignorance, then learn the truth in surprise when a loss occurs.
Based on the foregoing, we reverse the summary judgment as to the suppression claim and remand the cause for further proceedings; the summary judgment is affirmed insofar as it relates to the claim based on the theory of agency.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
ALMON, SHORES, and HOUSTON, JJ., concur.
MADDOX and COOK, JJ., concur in part and dissent in part.
HORNSBY, C.J., and INGRAM, J., recused.
MADDOX, Justice (concurring in part and dissenting in part).
I would affirm the judgment of the trial court; therefore, I concur in part and dissent in part.
COOK, Justice (concurring in part and dissenting in part).
I agree with the majority's disposition of the agency issue. As to its disposition of the "policy fraud" issue, however, I respectfully dissent.
The majority states that "Ballard does not question the general validity and enforceability of this type of provision in a replacement policy, when the meaning of the provision is known to the insured." 671 So.2d at 1373. I disagree with this construction of Ballard's argument. Ballard frames the issue under his policy fraud theory as follows:
"When the term `actual cash value' is not, in any way, defined in the policy, but upon total loss the formula utilized by the insurance industry differs from common usage and understanding, does the carrier have a duty to disclose the material fact that the insured can never receive a cash amount in event of total loss for which he has paid a premium?"
Brief of Appellant, at 3 (emphasis added).
In defining the issue in this manner, Ballard has, indeed, "question[ed] the general validity and enforceability of this type of provision in a replacement policy." In other words, while Ballard insisted on immediate and unconditional payment of the full policy amount for the restaurant ($85,000) and its contents ($45,000), the Syndicatewhich has never denied liability for the amount sought by Ballardinsisted only on reconstruction and replacement as conditions precedent to payment of those amounts. In reality, therefore, *1376 Ballard complains of not only the absence of an explicit definition of the phrase "actual cash value," but also the procedures the policy requires in case of a loss.
The majority focuses primarily on Ballard's companion argument, namely, that "the Syndicate's insurance policy is fraudulent upon its face, because it does not disclose that the definition of `actual cash value' is the replacement cost less depreciation." 671 So.2d at 1373. For the following reasons, I disagree with Ballard's arguments as to both of these complaints, which I shall discuss separately.

I. Procedure
In Hilley v. Allstate Ins. Co., 562 So.2d 184, 189 (Ala.1990) ("HilleyI"), this Court recognized the enforceability of a claims adjustment procedure like the one of which Ballard complains.[3] Because the insurance policy and the operative facts involved in Hilley I are so similar to those involved here, I shall set forth extensive portions of that opinion.
In Hilley I, James and Robbie Hilley sued Allstate Insurance Company, seeking damages under various theories, including breach of contract and bad faith refusal to pay "$38,000 for dwelling protection and $19,000 for personal property protection." Id. at 186. The Hilleys' homeowners' insurance policy contained the following pertinent provisions:
"`5. How We Settle a Loss
"`Building Structures
"`Covered loss to building structures insured under the Dwelling Protection coverage will be settled by one of the following methods:
"`a) Replacement Cost. This means there will not be a deduction for depreciation.
"`Payment will not exceed the smallest of the following amounts:
"`1) the replacement cost of that part of the building damaged for equivalent construction and use on the same premises;
"`2) the amount actually and necessarily spent to repair or replace the damaged building; or
"`3) the limit of liability applicable to the building.
"`We will not pay more than the actual cash value of the damaged property until the repair or replacement is completed. [Emphasis supplied.]
"`b) Actual Cash Value. This means there may be a deduction for depreciation.
"`If you decide not to repair or replace the damaged property, settlement will be on an actual cash value basis, not to exceed the limit of liability applicable to the building. You may make claim within 180 days after the date of loss for any additional payment on a replacement cost basis if you repair or replace the damaged property.'"
562 So.2d at 188.
After a fire destroyed their home, the Hilleys' attempted to recover the proceeds of their policy. Hilley I describes as follows the events connected with those attempts:
"[T]he Hilleys contacted Allstate and Ben Frazier, senior claims representative with Allstate, to make a claim for the loss caused by the fire. On January 29, 1986, the Hilleys filed a sworn `proof of loss' form with Allstate. At that point, the Hilleys received approximately $14,000 for the loss of the contents and approximately $13,000 for the actual cash value of their house. [Emphasis added.] Then, if they chose, they could replace or rebuild their house, and, within 180 days, make an additional claim for the amount by which their *1377 cost of rebuilding or replacing the house exceeded the actual cash value of the house. The draft for $13,000 was made payable to the Hilleys and to the finance company holding the mortgage. After paying off the mortgage debt, the Hilleys had approximately $3,000 of the $13,000 remaining.
"....
"After the loss, the Hilleys sought to obtain the best price to rebuild approximately the same house that had been destroyed by fire. They also attempted to obtain loans from various financial institutions to finance the rebuilding of their house, but their requests were denied. On May 26, 1986, the Hilleys' attorney wrote Frazier concerning the Hilleys' inability to obtain financing for their home and seeking reimbursement for additional living expenses that the Hilleys had incurred:
"`For your review, please find enclosed copies of correspondence from Norwest Financial and Central Bank of the South rejecting Mr. Hilley's application for mortgage money to rebuild his home. Mr. and Mrs. Hilley have been advised by Hicks Construction Company that they will begin rebuilding their home upon receipt of Allstate's guarantee to pay the additional $16,000.00 due under their policy. Mr. and Mrs. Hilley have exhausted all avenues in an effort to obtain the necessary funds to rebuild their home. ... [emphasis in Hilley]'
"A few days later, Frazier wrote the Hilleys, acknowledging receipt of their letter and stating that Allstate's agreement under the dwelling coverage provision of the policy was as follows: `[W]hen the amount already paid to the insured is spent toward the rebuilding of the house and cost of rebuilding begins to exceed this amount [then] I would pay a portion of the remaining amount and later pay another portion when the house was at a stage toward completion and could be verified. If this is not acceptable the only other offer I can make is according to the policy conditions in the policy."
562 So.2d at 186-87 (footnote omitted).
The trial court entered a summary judgment in favor of Allstate on all but one of the Hilleys' claims, and the Hilleys appealed. In reviewing that judgment, this Court explained:
"This Court and Alabama federal district courts applying Alabama law have explicitly held that replacement cost provisions similar or identical to those provisions at issue here are valid and enforceable. See Huggins v. Hanover Insurance Co., 423 So.2d 147 (Ala.1982); Blevins v. State Farm Fire & Casualty Co., No. CV-86-DT-0114-M (N.D.Ala. Aug. 22, 1986) (Propst, J.); see, also, Cherokee Farms, Inc. v. Fireman's Fund Insurance Co., 526 So.2d 871 (Ala.1988). In fact, the Allstate replacement cost/actual cash value provisions at issue here were held to be clear, unambiguous, and valid in Thompson v. Allstate Insurance Co., No. CV-87-0347-M (N.D.Ala. July 14, 1987).
"In Huggins v. Hanover Insurance Co., supra, the defendant insurance company issued an insurance policy to the plaintiffs with a total replacement cost limit of $120,000. That policy, like the Allstate policy at issue here, provided that the insurer would `pay no more than the actual cash value of the damage until actual repair or replacement is completed.' See 423 So.2d at 149. The insureds claimed that, even though they did not repair their home, they were still entitled to full replacement cost rather than the actual cash value that the insurer paid them. The trial court directed a verdict in favor of the insurer and this Court affirmed. In so holding, we stated that the insurance policy `limits all replacement cost recovery ... to actual cash value until repair or replacement is complete.' The Court further noted that `[p]rovisions like... those have been interpreted as providing a condition precedent to an insurer's duty to pay repair or replacement costs of an insured building. A party who has not *1378 repaired or replaced his insured building has not complied with the condition precedent to recovery under the policy and so cannot recover.' 423 So.2d at 150. (Emphasis supplied [in Hilley I].)
"Additionally, in Blevins v. State Farm Fire & Casualty Co., supra, the district court was faced with a claim by the insureds that they should be able to recover the full replacement cost policy limits for the contents of their house, which were destroyed by fire. There, as here, the policy provided that replacement cost would be paid only after the replacement had been completed.
"Judge Propst, citing Huggins v. Hanover Insurance Co., supra, held that, because the plaintiffs had not actually replaced the subject property in the time required by their policy, they had failed to meet a policy condition precedent and could not recover the replacement cost policy limits. In so holding, he noted:
"`Insurance policies which allow recovery of replacement costs often contain a provision requiring the insured to repair or replace the property within a specified or reasonable time. The policy issued to plaintiffs contained such language and courts have generally construed such a provision according to its plain meaning.'
"Blevins, supra. See Cherokee Farms, Inc. v. Fireman's Fund Insurance Co., supra (noting that the policy required complete replacement of premises before actual cash value payment would be supplemented with replacement cost payment). See, also, Thompson v. Allstate Insurance Co., supra (`Allstate has no duty to advance the proceeds' to fulfill the replacement precondition); State Farm Fire & Casualty Co. v. Ponder, supra, 469 So.2d 1262 at 1266 (Ala.1985) (`what is contemplated is that, ordinarily, actual cash value will be less than replacement cost [as it was here]; thus, the insurer will first pay the lesser amount; and then, upon completion within 180 days after the loss, will pay the difference between actual cash value and replacement cost'). (Emphasis supplied [in Hilley I].)
"Furthermore, a mere intention to replace does not trigger the insurer's replacement cost payment obligations. See, e.g., Blevins v. State Farm Fire & Casualty Co., supra. Consequently, even though the Hilleys allegedly intended to replace their house, but claim that they could not afford to effectuate that rebuilding, they cannot overcome the clear and unambiguous terms of their Allstate policy that precluded any replacement cost payment prior to the completion of rebuilding.
"We recognize the general rule that every contract carries with it an implied-in-law duty of good faith and fair dealing. Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981); see, also, Hoffman-LaRoche, Inc. v. Campbell, 512 So.2d 725 (Ala.1987). This duty provides that neither party will interfere with the rights of the others to receive the benefits of the agreement. See Childs v. Mississippi Valley Title Ins. Co., 359 So.2d 1146 (Ala.1978). We find no such interference here. We cannot allow the obligation of good faith and fair dealing to supply a term that adds something new or different to the rights and obligations to which the parties have expressly agreed or to vary clear contract terms. See, e.g., Metromedia Broadcasting Corp. v. MGM/UA Entertainment Co., 611 F.Supp. 415 (C.D.Cal.1985); Snyder v. Howard Johnson's Motor Lodges, Inc., 412 F.Supp. 724 (S.D.Ill.1976)."
Hilley I, 562 So.2d at 189-90.
This Court consequently affirmed the summary judgment as to the Hilleys' breach-of-contract and bad faith claims, holding: "Because the Hilleys failed to satisfy the policy's condition precedent, Allstate had no duty to advance the proceeds." Id. at 190 (emphasis added). Hilley I thus effectively rebuts Ballard's challenge to the procedure involved in this case.

II. Policy Definition
Closely related to this challenge is Ballard's contention that the Syndicate owed *1379 him a duty to include in the policy a specific definition of the phrase "cash value," because, he arguesand the majority of the Court agreesthe meaning given that phrase by the insurance industry varies from the definition commonly used. More specifically, Ballard insists that he "justifiably" failed to understand that "actual cash value" meant the value of his property, minus a deduction for depreciation, and that the Syndicate's use of the term in this sense without defining the term in the policy constituted policy fraud. I disagree with this argument, for the following reasons.
"Justifiable reliance" is a necessary element of any successful fraud claim. See Woodall v. Alfa Mutual Ins. Co., 658 So.2d 369 (Ala.1995); Hicks v. Globe Life & Accident Ins. Co., 584 So.2d 458 (Ala.1991). However, Ballard's policy provided:
"(a) The repairs, replacement or reinstatement (all hereinafter referred to as `replacement') must be executed with due diligence and dispatch;
"(b) Until replacement has been effected the amount of liability under this policy in respect of loss shall be limited to the actual cash value at the time of loss...."
(Emphasis added.) In my view, subsection (b) provides ample, actual notice that cash value is not equivalent to the face amount of the policy.
Furthermore, this Court has long defined "actual cash value" in precisely the sense in which it is used in Ballard's policy. In Glens Falls Ins. Co. of New York v. Garner, 229 Ala. 39, 43, 155 So. 533, 536 (1934), for example, this Court unequivocally stated: "`Actual cash value' means, and can only mean, what the thing is worth in money, allowing for depreciation." (Emphasis added.) See, also, Livingston v. Auto Owners Ins. Co., 582 So.2d 1038, 1040 (Ala.1991); Huggins v. Hanover Ins. Co., 423 So.2d 147, 151 (Ala. 1982) ("`In a total loss, depreciation is deducted from replacement cost to determine actual cash value'"); Reliance Ins. Co. v. Substation Products Corp., 404 So.2d 598, 609 (Ala.1981) ("Actual cash value means what the property is worth in money, allowing for depreciation"); see cases collected at 12 Ala.Digest Insurance Key Nos. 499, 499(1).
Because "actual cash value" has been defined consistently in this Court's published opinions, Ballard's policy-fraud claim runs afoul of the well-established rule "that all persons are presumed to know the law and the legal meaning of terms employed in establishing legal relations." Melton v. Ensley, 421 S.W.2d 44, 53 (Mo.App.1967) (emphasis added); see, also, Barber Pure Milk Co. v. Alabama State Milk Control Bd., 275 Ala. 489, 494, 156 So.2d 351, 355 (1963) ("`[a]ll men are charged as a matter of public policy with a knowledge of the law pertaining to their transactions'"); Birmingham Bar Ass'n v. Phillips & Marsh, 239 Ala. 650, 656, 196 So. 725, 731 (1940) ("All men are charged as matter of public policy with a knowledge of the law pertaining to their transactions"); 31A C.J.S. Evidence § 132(1), at 245-52 (1964). This rule imputes to Ballard constructive knowledge of the definition of "actual cash value," as that term was used in the policy. He cannot be deemed to have been deceived by the absence of a definition of which he had constructive knowledge. Ballard's noticeactual, as well as constructiveas to the legal definition of the phrase "cash value" thus effectively negates any claim of justifiable reliance.
For these reasons, I conclude that the policy is not fraudulent per se. Consequently, I respectfully dissent.
NOTES
[1] An "authorized" insurer is one duly certified by the Alabama Department of Insurance to "transact insurance in this state," Ala.Code 1975, § 27-3-1, upon compliance with the provisions of §§ 27-3-1 to -29.
[2] Ala.Code 1975, §§ 27-10-20 to -38, authorizes the purchase of "surplus lines" coverage, that is, insurance supplied by unauthorized insurers, after "diligent effort has been made" to purchase coverage from authorized insurers. See § 27-10-20.
[3] In Allstate Insurance Co. v. Hilley, 595 So.2d 873 (Ala.1992) ("Hilley II"), this Court affirmed a judgment entered on a jury verdict for the Hilleys on a fraud claim against the insurer. However, the fraud claim was based on representations made to the Hilleys by the insurer's agent. Consequently, that case, and the theory on which it was based, afford no support for Ballard's "policy fraud" theory.