This case involves a dispute regarding the amount of insurance proceeds payable for loss occasioned by fire.
James Larry Hilley and Robbie Hilley sued Allstate Insurance Company ("Allstate"), alleging breach of contract, outrageous conduct, bad faith refusal to pay, fraud, and violation of public policy and Ala. Code 1975, § 27-12-25.[1] The trial court granted Allstate's motion for summary judgment as to the Hilleys' claims of breach of contract, outrageous conduct, bad faith refusal to pay, and violation of public policy and § 27-12-25, but denied Allstate's motion as to the fraud claim.[2] *Page 186 
Thereafter, the trial court specifically determined that there was no just reason for delay in the entry of a judgment and, pursuant to Rule 54(b), A.R.Civ.P., the judgment was made final. Subsequently, the Hilleys appealed.[3] We affirm.
 Facts
On July 24, 1985, the Hilleys purchased a deluxe homeowner's insurance policy from Allstate with coverage and limits of liability of $38,000 for dwelling protection and $19,000 for personal property protection.[4] Thereafter, on January 6, 1986, the Hilleys' home and their personal contents were destroyed by fire. Subsequently, the Hilleys contacted Allstate and Ben Frazier, senior claims representative with Allstate, to make a claim for the loss caused by the fire. On January 29, 1986, the Hilleys filed a sworn "proof of loss" form with Allstate. At that point, the Hilleys received approximately $14,000 for the loss of the contents and approximately $13,000 for the actual cash value of their house.[5] Then, if they chose, they could replace or rebuild their house, and, within 180 days, make an additional claim for the amount by which their cost of rebuilding or replacing the house exceeded the actual cash value of the house. The draft for $13,000 was made payable to the Hilleys and to the finance company holding the mortgage. After paying off the mortgage debt, the Hilleys had approximately $3,000 of the $13,000 remaining.
After the fire, the Hilleys stayed with a relative for approximately one month until they moved into a 2-bedroom apartment, where they remained for approximately four to five months. They then rented a trailer, which they parked on a lot that they owned.
During this period, Frazier paid the Hilleys $570 for additional living expenses, along with $1,000 for "humanitarian needs" and $1,050 for clean-up and debris removal costs.
After the loss, the Hilleys sought to obtain the best price to rebuild approximately *Page 187 
the same house that had been destroyed by fire. They also attempted to obtain loans from various financial institutions to finance the rebuilding of their house, but their requests were denied. On May 26, 1986, the Hilleys' attorney wrote Frazier concerning the Hilleys' inability to obtain financing for their home and seeking reimbursement for additional living expenses that the Hilleys had incurred:
 "For your review, please find enclosed copies of correspondence from Norwest Financial and Central Bank of the South rejecting Mr. Hilley's application for mortgage money to rebuild his home. Mr. and Mrs. Hilley have been advised by Hicks Construction Company that they will begin rebuilding their home upon receipt of Allstate's guarantee to pay the additional $16,000.00 due under their policy. Mr. and Mrs. Hilley have exhausted all avenues in an effort to obtain the necessary funds to rebuild their home.
 "The following is a listing of the Hilley's living expenses since the fire:
 "Rental, utilities and groceries at sister's home $ 600.00 "Deposit on new apartment 110.00 "Four months rent $ $265.00 each (Feb. thru May) 1,060.00 "Alabama Power Company deposit 75.00 "Telephone transfer fee 75.00 "Installation of cable 34.50 --------- $1,954.50
 "Our records indicate that you have paid $570.00 to the Hilleys toward their living expense coverage. Please immediately furnish to this office your check in the sum of $1,384.50 payable to the Hilleys as reimbursement of this additional living expense." (Emphasis supplied.)
A few days later, Frazier wrote the Hilleys, acknowledging receipt of their letter and stating that Allstate's agreement under the dwelling coverage provision of the policy was as follows: "[W]hen the amount already paid to the insured is spent toward the rebuilding of the house and cost of rebuilding begins to exceed this amount that I would pay a portion of the remaining amount and later pay another portion when the house was at a stage toward completion and could be verified. If this is not acceptable the only other offer I can make is according to the policy conditions in the policy."
Frazier's letter also rejected the Hilleys' request for additional living expenses:
 "Per our discussion in regards to the [additional living expenses], I made an offer to pay additional three months' apartment rent for a total of $795.00 in advance to the rebuilding of the house in exchange for a release of this coverage. I only offered to do this to help the insureds and because the insureds and myself agreed that I would pay up to this amount as incurred which was more than enough time to repair their damaged house or to replace it." (Emphasis supplied.)
With regard to the Hilleys' request that Allstate guarantee the additional monies due under the policy to the construction company that had agreed to rebuild their home, Frazier's response read as follows:
 "In regards to the second paragraph of your letter regarding Allstate Guarantee to Construction Company, we do not have a contract with the construction company only with the insureds." (Emphasis supplied.)
The Hilleys contend that their tendering a contractor to build their house satisfied all obligations they had under the insurance contract; that Allstate's refusal to work with the contractor constituted a breach of the duty of good faith and fair dealing implied in law in every contract; and that, without obtaining this guarantee, they were unable to rebuild their home.
With respect to dwelling and contents protection, the substantive portion of the Hilley's policy provided:
"4. Our Settlement Options
 "In the event of a covered loss, we have the option to:
 "a) repair, rebuild or replace all or any part of the damaged, destroyed or stolen property with property of like kind and quality within a reasonable time; or
 "b) pay for all or any part of the damaged, destroyed or stolen property; or *Page 188 
 "c) take all or part of the covered property at the agreed or appraised value.
 "We will notify you of the option or options we
intend to exercise within 30 days after we
receive your signed, sworn proof of loss.
"5. How We Settle a Loss
"Building Structures
 "Covered loss to building structures insured under the Dwelling Protection coverage will be settled by one of the following methods:
 "a) Replacement Cost. This means there will not be a deduction for depreciation.
 "Payment will not exceed the smallest of the following amounts:
 "1) the replacement cost of that part of the building damaged for equivalent construction and use on the same premises;
 "2) the amount actually and necessarily spent to repair or replace the damaged building; or
 "3) the limit of liability applicable to the building.
 "We will not pay more than the actual cash value of the damaged property until the repair or replacement is completed. [Emphasis supplied.]
 "b) Actual Cash Value. This means there may be a deduction for depreciation.
 "If you decide not to repair or replace the damaged property, settlement will be on an actual cash value basis, not to exceed the limit of liability applicable to the building. You may make claim within 180 days after the date of loss for any additional payment on a replacement cost basis if you repair or replace the damaged property.
". . . .
"Personal Property Replacement Cost
 "When the declarations page indicates that replacement cost applies under Coverage C — Personal Property Protection:
 "Loss to personal property . . . will be settled by one of the following methods:
 "a) Replacement Cost. This means there will not be a deduction for depreciation.
 "Payment for any single item will not exceed the smallest of the following amounts:
 "1) the cost to replace the item with a similar item of like kind and quality;
"2) the cost of repair or restoration;
 "3) the limit of liability shown on the declarations page for Personal Property Protection coverage, or any special limit of liability described in the policy.
 "We will not pay more than the actual cash value of the damaged property until the repair, restoration or replacement is completed.
[Emphasis supplied.]"
The policy also provided for the payment of reasonable additional living expenses in some circumstances:
"Additional Protection
"1. Loss of Use of Your Residence Premises
 "a) We will pay the reasonable increase in living expenses necessary to maintain your normal standard of living when a loss we cover makes your residence premises uninhabitable.
 "Payment shall not exceed nine consecutive months from the time of loss, or at least time to either:
 "1) repair or replace the property we cover, using due diligence and dispatch or [emphasis supplied];
 "2) if you permanently relocate, the shortest time for your household to settle elsewhere."
The policy further provided the conditions under which additional living expenses would be paid:
"Section 1 Conditions
". . . .
"3. What You Must Do After a Loss
 "In the event of a loss to any property that may be covered by this policy, you must: [Emphasis supplied.]
 "a) promptly give us or our agent written notice. *Page 189 
". . . .
 "e) produce receipts for any increased costs to maintain your standard of living while you reside elsewhere, and records supporting any claim for loss of rental income. [Emphasis supplied.]"
This case was filed prior to June 11, 1987; therefore, the applicable standard of review is the "scintilla rule." See Ala. Code 1975, § 12-21-12, and Rule 56(c), A.R.Civ.P. Summary judgment for the defendant is proper when there is no genuine issue of material fact as to any element of a cause of action and the defendant is entitled to a judgment as a matter of law. See Wilson v. Brown, 496 So.2d 756 (Ala. 1986). We must view the record in a light most favorable to the plaintiff and resolve all reasonable doubts against the defendant. See Bogle v.Scheer, 512 So.2d 1336 (Ala. 1987). Once the defendant has made a prima facie showing that there is no genuine issue of material fact and that the defendant is entitled to a judgment, the burden shifts to the plaintiff to present at least a scintilla of evidence indicating that there is a genuine issue of material fact. Dunaway v. King, 510 So.2d 543 (Ala. 1987).
The issues before us are whether the Hilleys presented a scintilla of evidence in support of their claims of breach of contract, bad faith refusal to pay, and violation of public policy and § 27-12-25, as to the replacement cost for their house and as to additional living expenses, so as to preclude the entry of summary judgment in favor of Allstate on these issues.
 Breach of Contract — Replacement Cost
This Court and Alabama federal district courts applying Alabama law have explicitly held that replacement cost provisions similar or identical to those provisions at issue here are valid and enforceable. See Huggins v. HanoverInsurance Co., 423 So.2d 147 (Ala. 1982); Blevins v. State FarmFire Casualty Co., No. CV-86-DT-0114-M (N.D.Ala. Aug. 22, 1986) (Propst, J.); see, also, Cherokee Farms, Inc. v.Fireman's Fund Insurance Co., 526 So.2d 871 (Ala. 1988). In fact, the Allstate replacement cost/actual cash value provisions at issue here were held to be clear, unambiguous, and valid in Thompson v. Allstate Insurance Co., No. CV-87-0347-M (N.D.Ala. July 14, 1987).
In Huggins v. Hanover Insurance Co., supra, the defendant insurance company issued an insurance policy to the plaintiffs with a total replacement cost limit of $120,000. That policy, like the Allstate policy at issue here, provided that the insurer would "pay no more than the actual cash value of the damage until actual repair or replacement is completed." See 423 So.2d at 149. The insureds claimed that, even though they did not repair their home, they were still entitled to full replacement cost rather than the actual cash value that the insurer paid them. The trial court directed a verdict in favor of the insurer and this Court affirmed. In so holding, we stated that the insurance policy "limits all replacement cost recovery . . . to actual cash value until repair or replacement is complete." The Court further noted that "[p]rovisions like .. . those have been interpreted as providing a conditionprecedent to an insurer's duty to pay repair or replacementcosts of an insured building. A party who has not repaired orreplaced his insured building has not complied with thecondition precedent to recovery under the policy and so cannotrecover." 423 So.2d at 150. (Emphasis supplied.)
Additionally, in Blevins v. State Farm Fire Casualty Co., supra, the district court was faced with a claim by the insureds that they should be able to recover the full replacement cost policy limits for the contents of their house, which were destroyed by fire. There, as here, the policy provided that replacement cost would be paid only after the replacement had been completed.
Judge Propst, citing Huggins v. Hanover Insurance Co., supra, held that, because the plaintiffs had not actually replaced the subject property in the time required by their policy, they had failed to meet a policy condition precedent and could not recover *Page 190 
the replacement cost policy limits. In so holding, he noted:
 "Insurance policies which allow recovery of replacement costs often contain a provision requiring the insured to repair or replace the property within a specified or reasonable time. The policy issued to plaintiffs contained such language and courts have generally construed such a provision according to its plain meaning."
Blevins, supra. See Cherokee Farms, Inc. v. Fireman's FundInsurance Co., supra (noting that the policy required complete replacement of premises before actual cash value payment would be supplemented with replacement cost payment). See, also,Thompson v. Allstate Insurance Co., supra ("Allstate has no duty to advance the proceeds" to fulfill the replacement precondition); State Farm Fire Casualty Co. v. Ponder,469 So.2d 1262 at 1266 (Ala. 1985) ("what is contemplated is that, ordinarily, actual cash value will be less than replacement cost [as it was here]; thus, the insurer will first pay the lesser amount; and then, upon completion within 180 days after the loss, will pay the difference between actual cash value and replacement cost"). (Emphasis supplied.)
Furthermore, a mere intention to replace does not trigger the insurer's replacement cost payment obligations. See, e.g.,Blevins v. State Farm Fire Casualty Co., supra. Consequently, even though the Hilleys allegedly intended to replace their house, but claim that they could not afford to effectuate that rebuilding, they cannot overcome the clear and unambiguous terms of their Allstate policy that precluded any replacement cost payment prior to the completion of rebuilding.
We recognize the general rule that every contract carries with it an implied-in-law duty of good faith and fair dealing.Chavers v. National Security Fire Casualty Co., 405 So.2d 1
(Ala. 1981); see, also, Hoffman-LaRoche, Inc. v. Campbell,512 So.2d 725 (Ala. 1987). This duty provides that neither party will interfere with the rights of the others to receive the benefits of the agreement. See Childs v. Mississippi ValleyTitle Ins. Co., 359 So.2d 1146 (Ala. 1978). We find no such interference here. We cannot allow the obligation of good faith and fair dealing to supply a term that adds something new or different to the rights and obligations to which the parties have expressly agreed or to vary clear contract terms. See, e.g., Metromedia Broadcasting Corp. v. MGM/UA EntertainmentCo., 611 F. Supp. 415 (C.D.Cal. 1985); Snyder v. HowardJohnson's Motor Lodges, Inc., 412 F. Supp. 724 (S.D.Ill. 1976).
Because the Hilleys failed to satisfy the policy's condition precedent, Allstate bad no duty to advance the proceeds. Therefore, we hold that the trial court properly entered summary judgment on the breach of contract claim.
 Bad Faith — Replacement Cost
In a normal case, such as this one, to prevail on a claim based on bad faith refusal to pay, the plaintiff must be entitled to a directed verdict on the underlying contract claim. Kizziah v. Golden Rule Insurance Co., 536 So.2d 943
(Ala. 1988); Payne v. Nationwide Mutual Insurance Co.,456 So.2d 34 (Ala. 1984). Although this case involves a summary judgment, not a directed verdict, the standards of review for both are essentially the same. See Kizziah v. Golden Rule Insurance Co., supra.
Having affirmed Allstate's summary judgment as to the Hilleys' breach of contract claim with regard to replacement cost, we must also affirm that summary judgment as to the Hilleys' bad faith claim with regard to replacement cost. SeeStrickland v. Alabama Farm Bureau Mutual Cas. Ins. Co.,502 So.2d 349 (Ala. 1987); Madison County Sheriff's Posse, Inc. v.Horseman's United Ass'n, Inc., 434 So.2d 1387 (Ala. 1983).
 Breach of Contract — Additional Living Expenses
The Hilleys argue that Allstate's failure to pay additional living expenses constituted a breach of contract. They argue *Page 191 
that, under the following provision[6] of the policy, they were entitled to additional living expenses for nine months:
 "a) We will pay the reasonable increase in living expenses necessary to maintain your normal standard of living when a loss we
cover makes your residence premises
uninhabitable.
 "Payment shall not exceed nine consecutive months
from the time of loss, or the least time to
either:
 1) repair or replace the property we cover, using due diligence and dispatch or [emphasis supplied];
 2) if you permanently relocate, the shortest time for your household to settle elsewhere."
Allstate contends that nine months is a maximum, not a minimum, amount of time for paying additional living expenses; that the minimum time for additional living expense payments to continue was that amount of time necessary to repair or replace the house through the use of due diligence and dispatch; that the Hilleys had been informed by at least one experienced contractor that three weeks would be a sufficient amount of time to rebuild, and that the affidavit of another experienced contractor indicated that 90 days would have been a reasonable period for the Hilleys to completely rebuild their house if they were using due diligence and dispatch; and that, since both the three-week period and the 90-day period had passed before the Hilleys requested further additional living expenses, Frazier could properly refuse to pay such expenses because the repair or replacement, as contemplated by the policy, had not been made with due diligence and dispatch; but that Frazier still offered to pay three months' additional living expenses in exchange for a release.
The Hilleys, on the other hand, contend that they had a right to additional living expenses for up to nine months, but that Frazier modified the nine-month provision by stating what he believed to be a reasonable period of time to permanently relocate and by stating that he was obligated only to pay additional living expenses "based on the reasonable period of time it would take to build a house back." Furthermore, the Hilleys contend that, within 150 days of the loss, they had attempted to perform under the contract by securing a contractor who would go forward and begin rebuilding but that Frazier rejected this effort; that Frazier stated that Allstate owed no more than three months' additional living expenses but would not pay that money to the Hilleys, even though he felt they were entitled to it, until such time as the Hilleys agreed to execute a release of any future additional living expenses. Based on the foregoing, we hold that the Hilleys presented a scintilla of evidence that they used due diligence and dispatch in replacing their home.
However, in addition to the "due diligence and dispatch" provision, the Hilleys' policy specifically made the submission of receipts a precondition to payment of additional living expenses:
 "3. What You Must Do After a Loss "In the event of a loss to any property that may be covered by this policy, you must: [Emphasis supplied.]
"a) promptly give us or our agent written notice.
". . . .
 "e) produce receipts for any increased costs to maintain your standard of living while you reside elsewhere, and records supporting any claim for loss of rental income. [Emphasis supplied.]"
It is undisputed that no receipts were provided for any additional living expenses other than the ones for which Allstate had already paid. According to Mr. Hilley's testimony, Frazier told Mr. Hilley to "save all receipts[,] that I [Mr. Hilley] have to turn them in to [Frazier]." Furthermore, Mr. Hilley testified that he never submitted to Frazier any receipts as to expenses that Frazier had said he could not cover or would not pay. Thus, because no further *Page 192 
receipts were submitted, under the clear and unambiguous terms of the contract Allstate was under no duty to provide any additional living expense payments to the Hilleys.
In support of its motion for summary judgment, Allstate submitted affidavits, deposition testimony, and a copy of the policy to show prima facie that it did not breach its contract with the Hilleys. In his deposition testimony, Frazier stated that, even though the Hilleys requested payment for further expenses, they did not present evidence that they were going to start reconstruction nor had they started reconstruction; that, in the absence of beginning construction in what he considered to be a reasonable time and in the absence after four months of any tangible evidence that the Hilleys were going to rebuild, the Hilleys were not entitled to any further payments for additional living expenses; and that the Hilleys never produced receipts evidencing any further reimbursable living expenditures other than those reimbursed expenses already paid to the Hilleys for which they had provided receipts.
Once Allstate made a prima facie showing that no genuine issue of material fact existed, the burden shifted to the Hilleys to come forth with specific facts to establish that a genuine issue of fact did exist. After a thorough review of the Hilleys' materials submitted in opposition to the motion for summary judgment, we find that the Hilleys presented no evidence to rebut Allstate's showing that the Hilleys had failed to satisfy the condition precedent of submitting receipts for additional living expenses. Therefore, we hold that the trial court properly entered summary judgment as to the breach of contract claim for additional living expenses.
 Bad Faith — Additional Living Expenses
We recognize the Hilleys' position that Allstate's conduct, through the actions of Frazier, who conditioned additional living expense payments to the Hilleys on their executing a release, constituted bad faith. However, because we have affirmed the summary judgment for Allstate as to the Hilleys' breach of contract claim with regard to additional living expenses, we must affirm the summary judgment for Allstate as to the claim of bad faith refusal to pay with regard to additional living expenses. See Strickland v. Alabama FarmBureau Mutual Cas. Ins. Co., supra; Madison County SheriffsPosse, Inc. v. Horseman's United Ass'n, Inc., supra.
AFFIRMED.
HORNSBY, C.J., and MADDOX, JONES, SHORES, STEAGALL and KENNEDY, JJ., concur.
ALMON, J., concurs in the result.
[1] We are unable to find any § 27-12-25 in the Code. Therefore, we cannot hold the trial court in error for entering summary judgment in favor of Allstate on the claim based on this Code section. We do note that Ala. Code 1975, § 27-12-24, is the codification of the tort of bad faith: "No insurer shall, without just cause, refuse to pay or settle claims arising under coverages provided by its policies in this state, and with such frequency as to indicate a general business practice in this State. . . ." However, we cannot assume for purposes of this appeal that the Hilleys intended their complaint to allege violation of Ala. Code 1975, § 27-12-24.
[2] The fraud claim reads as follows:
 "1. Plaintiffs aver that the defendant represented to the plaintiffs that [it] would place a proper and appropriate value on the house, charge a proper and appropriate premium based on the value of the house and that the defendant would abide by the valuation of the house it placed or had placed upon the house.
 "2. In reliance upon the representations made to the plaintiffs by the defendant or agents of the defendant, the plaintiff[s] purchased the insurance and were assessed a premium for dwelling protection in the amount of $38,000 and personal property protection in the amount of $19,000 and family liability (each occurrence) protection in the amount of $25,000 and guest medical payments (each person) in the amount of $500.00 and each accident in the amount of $25,000.
 "3. Plaintiffs aver that plaintiffs relied upon the representations of the defendant that this was the appropriate and proper valuation of the property and plaintiffs paid the assessed premium based upon the representations of the defendant that this was the appropriate and proper valuation of the property as of July 25, 1985.
 "4. Plaintiffs aver that in reliance upon the representations made to the plaintiffs by the defendant or agents of the defendant, the plaintiffs understood and expected the property to be completely insured and protected from loss.
 "5. Plaintiffs aver that at the time they purchased the insurance on the said property all representations made to the defendant by the plaintiff[s] were truthful and correct and that the representations made to the plaintiffs by the defendant were taken to be true and correct by the plaintiffs and were relied upon by the plaintiffs in like respect.
 "6. Plaintiffs aver that upon suffering the loss as heretofore identified on the 6th day of January, 1986, plaintiffs in respect and response to the representations previously made to them by defendant and agents of the defendant, anticipated receipt of reimbursement for losses in the amount of $38,000 on the dwelling and $19,000 on personal property protection. Plaintiffs aver that the defendant instead offered and paid only $11,000 on the personal property protection and further only paid $14,050 on the dwelling coverage, which according to the defendant was the actual cash value of the property plus clean up and debris removal.
 "7. Plaintiffs aver that the defendant valued the home of the plaintiff in the amount of $38,000 and charged a premium accordingly. Plaintiffs aver that the value [of the house] in which the plaintiffs were residing had not decreased in value but instead had increased in value in the six-month period between the time the defendant had valued the property and the time that the property had suffered a loss by fire. Plaintiffs aver that they relied to their detriment upon the valuation given to the property by the defendant and had traveled under the understanding that should they suffer a complete loss of their house, they would receive $38,000 on the dwelling and $19,000 on the contents.
 "8. Plaintiffs aver that the defendant represented to the plaintiffs that their reliance as heretofore alleged was proper and appropriate and that the defendants anticipated and expected the plaintiffs to rely upon the representations of the valuation of the house as had been made by the defendant or agents of the defendant.
". . . .
 "10. Plaintiffs further aver that the defendant fraudulently misrepresented material facts with respect to the defendant's responsibilities under the policy of insurance made available to the plaintiffs and as a proximate result of the fraudulent misrepresentations made to the plaintiffs by the defendant, plaintiffs have been caused to suffer damages in the amount of $500,000.00 compensatory damages and plaintiffs demand judgment against the defendant in the amount of $500,000.00 punitive damages, for the reckless, willful and/or intentional misrepresentations under the policy provisions as heretofore alleged."
[3] The Hilleys appealed the trial court's summary judgment in favor of Allstate on their claims alleging breach of contract, outrageous conduct, bad faith, and violation of public policy and Ala. Code 1975, § 27-12-25. However, they failed to argue the outrageous conduct claim in their brief; therefore, that issue is not before us.
[4] It is undisputed that the policy was in full force and effect at all times material to this litigation.
[5] For purposes of this appeal, the Hilleys do not dispute Allstate's calculation of the actual cash value under the policy.
[6] The type of additional living expense provision at issue here has been upheld as clear and unambiguous. See Wallace v.Auto-Owners Insurance Co., 421 So.2d 131 (Ala.Civ.App. 1982), citing Aetna Casualty Surety Co. v. Chapman, 240 Ala. 599,200 So. 425 (1941).