BRYAN, Justice.
Har-Mar Collisions, Inc. (“Har-Mar Collisions”), appeals from a judgment of the Mobile Circuit Court (“the trial court”) following a jury verdict of $101,054.40 in favor of Har-Mar Collisions on its breach-of-contract claim against Scottsdale Insurance Company (“Scottsdale”). The trial court offset the jury verdict by the amounts Har-Mar Collisions had recovered from a settlement agreement it had entered into with Auto-Owners Insurance Company and Owners Insurance Company (hereinafter collectively referred to as “Auto-Owners”) and from a settlement agreement it had entered into with CRC Insurance Services, Inc. (“CRC”). Because the total amount Har-Mar Collisions recovered from those two settlement agreements exceeded the amount of the jury verdict, the trial court entered a judgment awarding Har-Mar Collisions $0. Har-Mar Collisions appeals, challenging the setoff. Scottsdale cross-appeals from the judgment against it.

Facts and Procedural History

In March 2004, Wayne Hartung began operating an automobile paint-and-body shop (“the auto shop”) in Mobile. Wayne incorporated the auto shop as Har-Mar Collisions, Inc., but operated the auto shop under the trade name Marshall Paint & Collision. The auto shop consisted of four buildings owned by Hartung Commercial Properties, Inc. (“Hartung”), which leased the property to Har-Mar Collisions. First National Bank of Baldwin County (“First National”) financed Hartung’s purchase of the property and retained a mortgage on the property to secure its interest. Wayne is the principal and sole shareholder of both Har-Mar Collisions and Hartung.
Before 2010, Wayne had insured the auto shop with, among other insurance companies, Farmers Insurance Co. (“Farmers”). However, sometime in 2010, Farmers informed Wayne that it would no longer be providing insurance coverage for wind damage for properties south of Highway 90 in Mobile; the auto shop was located approximately 180 feet south of Highway 90. Because Wayne wanted to maintain insurance coverage for wind damage, he elected not to renew the Farmers policy. Instead, Wayne contacted Kris Kahalley, a certified insurance counselor employed with International Assurance, Inc. (“International Assurance”), a company that assists businesses with procuring commercial insurance, to inquire about obtaining insurance for the auto shop. Wayne provided Kahalley with his Farmers policy and told Kahalley that he wanted coverage identical to the coverage provided in the Farmers policy.
To receive proposals from various insurance companies, Kahalley was required to complete a “commercial insurance application” on behalf of Har-Mar Collisions. Using the Farmers policy as a guide, Ka-halley listed the prospective insured’s name on the application as “Marshall Paint & Collision” and listed the mailing address of the prospective insured as
“HARMAR Inc dba
2869 Government Boulevard
Mobile, AL 36606,”
(Capitalization in original.)
Kahalley then provided the application to CRC, an insurance broker, to be submitted to various insurance companies that would then offer Har-Mar Collisions proposals for insurance coverage. After receiving proposals, Wayne ultimately decided to split the insurance coverage for the auto shop between two insurance policies, one with Auto-Owners (“the Auto-Owners policy”) and one with Scottsdale (“the Scottsdale policy”), both of which were effective from December 15, 2010, to December 15, 2011, The Auto-Owners policy *895 provided garage-liability coverage and commercial umbrella-liability coverage.[1] The Scottsdale policy provided commercial-property coverage and lists the insured’s name and mailing address as:
“HARMAR, INC.
DBA MARSHALL PAINT & COLLISION
2869 GOVERNMENT BOULEVARD MOBILE, AL 36606.”
(Capitalization in original.)
On January 24, 2011, a fire destroyed the auto shop. The following day, Kahalley submitted a “property-loss notice” to Scottsdale and, either that day or the next, requested on behalf of Har-Mar Collisions a $50,000 advance on the claim for Har-Mar Collisions’ lost “business income.” On January 27, 2011, Scottsdale sent Wayne a letter informing him that it , had engaged an independent claims adjuster to inspect the auto shop and to evaluate the loss. That letter also included a $50,000 check payable to “HARMAR, INC. (DBA): MARSHALL PAINT & COLLISION; AND FIRST NATIONAL BANK OF BALDWIN COUNTY.” (Capitalization in original.) Wayne testified that he was uncertain why First National was listed as a payee on the check but that he deposited the check into Har-Mar Collisions’ bank account and used the money to pay the ongoing expenses associated with the business operations of the auto shop.
On , March 22, 2011, Scottsdale sent Wayne a letter indicating that it had not concluded the investigation of his claim. Concerning Scottsdale’s investigation, that letter stated, in pertinent part:
“In response to our request for the Articles of Incorporation for Harmar, Inc. d/b/a Marshall Paint & Collision, we received the Articles of Incorporation for Har-Mar Collisions, Inc. We are unclear how one corporation relates to the other. In order that we can further our investigation of the financial interest of the Named Insured, please provide us with documentation of the financial interest of Harmar, Inc. d/b/a Marshall Paint & Collision in the property for which claim has been submitted. Please provide us with copies of the Articles of Incorporation, which specify the names of the officers of the corporation known as Harmar, Inc. d/b/a Marshall Paint & Collision.”
Over the next month, the parties exchanged correspondence in which Wayne, through counsel, asserted that the Scottsdale policy insured the auto shop, incorporated as Har-Mar Collisions; that he had never incorporated a business under the name “ ‘Harmar, Inc. dba Marshall Paint and Collision” ’; and that the use of that name in the Scottsdale policy must have been “a typo or abbreviation.” Scottsdale, on the other hand, continued to contend that Harmar, Inc., was the named insured in' the Scottsdale policy and, as a result, sought documentation from Wayne indicating what, if any, insurable interest Har-mar, Inc., had in the auto shop.
In May 2011, Wayne, as principal of Har-Mar Collisions, submitted a proof-of-loss form to Scottsdale. Although Scottsdale never formally denied the claim, it continued to investigate the claim over the *896 next several weeks and refused to make any additional payments on the claim on the basis that its investigation was ongoing. During that time, Scottsdale continued to assert that it was unclear as to what interest Harmar, Inc., the named insured in the Scottsdale policy, had in the auto shop.
On or around June 8, 2011, Mike Nor-den, a commercial lender with First National, received a letter from Scottsdale informing him that First National, as mortgagee of the insured property, had a right under the Scottsdale policy to receive “loss payment” for the loss of the buildings composing the auto shop, regardless of whether the policyholder’s claim was denied. In response to that letter, First National submitted a proof-of-loss form to Scottsdale. On August 4, 2011, Scottsdale issued a check to First National in the amount of $478,268.60, which was approximately $89,000 less than Hartung’s mortgage indebtedness at that time. Norden inquired of Scottsdale why the check First National received was approximately $39,000 less than First National’s interest in the insured property, to which Scottsdale replied that it had already paid Wayne $50,000 and that it was under the impression that those funds had been, or should have been, applied to the mortgage. To make up the difference, First National liquidated a certificate of deposit Wayne had provided as additional collateral for the mortgage and applied part of the proceeds to the mortgage, thereby extinguishing the mortgage and satisfying First National’s interest in the auto shop.
On August 10, 2011, Har-Mar Collisions sued Scottsdale and CRC. That complaint sought a judgment declaring that Har-Mar Collisions was the named insured on the Scottsdale policy, asserted breach-of-contract and bad-faith-failure-to-pay claims against Scottsdale, and asserted negligence and misrepresentation/fraud claims against CRC for its alleged failure to procure insurance for the auto shop.
On April 6, 2012, Auto-Owners filed a motion to intervene in the action. In that motion, Auto-Owners indicated that a separate action had been filed in the trial court by Hartung against, among other defendants, Har-Mar Collisions, in which Hartung alleged that Har-Mar Collisions was leasing from Hartung the buildings in which Har-Mar Collisions was operating the auto shop and that Har-Mar Collisions had negligently/wantonly caused the fire that had destroyed the auto shop. Because the Auto-Owners policy provides coverage for Har-Mar Collisions’ liabilities, and because Wayne is the principal of both Hartung and Har-Mar Collisions, Auto-Owners maintained that there were “significant questions regarding coverage under the [Auto-Owners policy].” As a result, Auto-Owners asked the trial court to grant its motion to intervene so that a determination of Auto-Owners’ obligations could be determined. The trial court granted the motion to intervene.
On January 22, 2013, Har-Mar Collisions amended its complaint to add International Assurance, Kahalley, and Auto-Owners as defendants and to add the following claims: a negligence claim against International Assurance and Kahalley for their alleged failure to obtain insurance for the auto shop and breach-of-contract and bad-faith-failure-to-pay claims against Auto-Owners.
On August 4, 2014, Har-Mar Collisions and CRC entered into a “pro tanto release and settlement agreement” under which Har-Mar Collisions agreed to release all claims it had or could have asserted against CRC arising from the January 24, 2011, fire in exchange for a payment of $12,500 from CRC. Pursuant to the settlement agreement, Har-Mar Collisions and *897 CRC filed a “joint stipulation of dismissal” requesting that the trial court dismiss with prejudice Har-Mar Collisions’ claims against CRC. On August 8, 2014, the trial court entered an order dismissing with prejudice all claims against CRC.
On November 18, 2014, Har-Mar Collisions and Auto-Owners entered into a “mutual general pro tanto release and settlement agreement” under which Har-Mar Collisions agreed to release all claims it had or could have asserted against Auto-Owners arising from the January 24, 2011, fire in exchange for a payment of $185,000 from Auto-Owners. The settlement agreement indicated that $130,000 of that $135,000 payment would be paid to Har-tung on behalf of Har-Mar Collisions. On November 26, 2014, Har-Mar Collisions and Auto-Owners filed a “joint motion for voluntary dismissal with prejudice” requesting that the trial court dismiss with prejudice Har-Mar Collisions’ claims against Auto-Owners and dismiss Auto-Owners’ complaint in intervention. On November 26, 2014, the trial court entered an order in accordance with that motion.
Before trial, the parties agreed that the jury would not be informed of Har-Mar Collisions’ settlement agreements with Auto-Owners and CRC and that the issue of a setoff against a jury verdict against Scottsdale would be reserved for the trial court’s determination after the jury returned its verdict. On May 4 through May 7, 2015, the trial court held a jury trial on Har-Mar Collisions’ remaining claims against International Assurance, Kahalley, and Scottsdale. At the close of evidence, Scottsdale filed a motion for a judgment as a matter of law in which it argued that there was no evidence upon which the trial court could grant Har-Mar Collisions’ request for a judgment declaring that Har-Mar Collisions was the named insured in the Scottsdale policy. Thus, Scottsdale argued, in the absence of a reformation of the Scottsdale policy to that effect, Har-Mar Collisions lacked standing to maintain its action against Scottsdale. The trial court, although it did not enter an order to that effect, orally denied Scottsdale’s motion.
At the close of all the evidence, the parties’ attorneys argued (outside the jury’s presence) to the trial court whether reformation of the policy to reflect Har-Mar Collisions as the named insured was proper. After hearing the attorneys’ arguments, the trial court made the following statement:
“I focused on the language [that] the parties had agreed upon at the time the instruments were executed, what they had agreed upon. And to me what they had agreed upon was a—what’s clear to me is that they had agreed to insure Marshall Paint and Collision, whatever the corporate entity was, Marshall Paint and Collision, a body shop, South Government Boulevard, at that location, for whatever the ... coverages were, and neither side thought they were insuring some nonexistent company with no corporate existence or anything. I don’t believe either side figured that’s what they were doing. So I’m going to find that the reformation is appropriate, there was a mutual mistake, and I’m going to reform the contract so that the insured is Har-Mar Collisions, Inc. d/b/a Marshall Paint and Collision, which puts us in a position to go forward with other matters.”
The trial court also indicated to the parties that it would offset any verdict against Scottsdale with the $135,000 and $12,500 settlements Har-Mar Collisions had received from Auto-Owners and CRC, respectively.
After closing arguments, the jury returned a verdict in favor of Har-Mar Colli *898 sions on its breach-of-contract claim and awarded damages of $101,054.40, returned a verdict in favor of Scottsdale on Har-Mar Collisions’ bad-faith-failure-to-pay claim, and returned a verdict in International Assurance’s and Kahalley’s favor on Har-Mar Collisions’ negligence claim. Pursuant to that verdict, the trial court entered a judgment stating, in pertinent part:
“Prior to the verdict, [Har-Mar Collisions] entered into a pro tanto settlement with [Auto-Owners] for $135,000 and [CRC] for $12,500, for a total amount of $147,500. The pro tanto settlements were not disclosed to the jury, and thus the verdict must be offset by the amount of the pro tanto settlements. “It is therefore Ordered and Adjudged by the Court that a final judgment in the amount of $0 is entered in favor of [Har-Mar Collisions] and against [Scottsdale].”
On June 15, 2015, Har-Mar Collisions filed a motion to alter, amend, or vacate the judgment. In that motion, Har-Mar Collisions argued that the trial court erred in offsetting the jury verdict by the amounts Har-Mar Collisions had recovered through the Auto-Owners and CRC settlement agreements and that Har-Mar Collisions was entitled to prejudgment interest on the jury verdict. Har-Mar Collisions also filed a motion to tax costs against Scottsdale. The trial court denied both motions on July 17, 2015. Har-Mar Collisions timely appealed, and Scottsdale timely cross-appealed. Because the issues in Scottsdale’s cross-appeal could be dis-positive of all issues, we first address the cross-appeal.

Case No. 11⅛1267

Scottsdale raises two arguments on appeal: (1) that the trial court erred in reforming the contract to reflect Har-Mar Collisions as the named insured; and (2) that, assuming the correction of that alleged error, Har-Mar Collisions lacked standing to maintain its breach-of-contract and bad-faith-failure-to-pay claims.

Standard of Review

“The standard applicable to reformation cases is that the decision of a trial judge who heard ore tenus evidence will not be overturned on appeal if it is supported by competent evidence and is not manifestly unjust or plainly and palpably erroneous.” Powell v. Evans, 496 So.2d 723, 726 (Ala.1986).

Discussion

“In Alabama, reformation of contracts is governed by § 8-1-2, Ala.Code 1975; that Code section provides:
“‘When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons in good faith and for value.’
“This Court has stated that ‘[t]he terms of the statute [§ 8-1-2] are plain and unambiguous and give the equity court power to reform or revise a written contract only when the requirements of the statute have been met.’ American Liberty Ins. Co. of Birmingham v. Leonard, 270 Ala. 17, 21, 115 So.2d 470, 473 (1959). Moreover, it is the burden of the party seeking reformation to establish by clear and convincing evidence that those requirements have been met. Clemons v. Mallett, 445 So.2d 276, 279 (Ala.1984).”
*899 Goodwyn, Mills & Cawood, Inc. v. Markle Ins. Co., 911 So.2d 1044, 1047-48 (Ala. 2004).
It is evident from the trial court’s on-the-record statement that it reformed the Scottsdale policy on the basis of a mutual mistake, a proper ground under § 8-1-2, Ala.Code 1975, for reforming a contract. “This Court has adopted the definition of ‘mutual mistake’ found in Restatement (Second) of Contracts § 152 (1981), which defines it as a ‘mutual misunderstanding concerning a basic assumption on which the contract was made.’ Finley v. Liberty Mut. Ins. Co., 456 So.2d 1065 (Ala.1984). . ." EBSCO Indus., Inc. v. Royal Ins. Co. of America, 775 So.2d 128, 131 (Ala.2000). Thus, if the parties to a contract enter into that contract with a “‘mutual misunderstanding concerning a basic assumption on which the contract was made,’ ” a trial court, upon application by an aggrieved party to the contract and the presentation of clear and convincing evidence of that “mutual misunderstanding,” may reform the contract to express the parties’ true intent in entering into the contract. Although our research has not unearthed an Alabama case directly on point with the facts of this case, the Court of Appeals of Ohio in Gooslin v. B-Affordable Tree Serv., (No. S-10-045, Aug. 12, 2011) 2011-Ohio-4048, had before it facts that are nearly identical to those of this case.[2]
In Gooslin, William Mira, a 50% shareholder in B-Affordable Tree Service, Inc. (“B-Affordable”), a tree-trimming business, was involved in an automobile accident with Heather Gooslin while he was driving his personal automobile, which displayed advertisements for B-Affordable. Mira had a personal automobile-insurance policy issued by State Automobile Mutual Insurance Company (“State Auto”), and B-Affordable believed that it had automobile insurance under a separate State Auto policy that provided coverage for accidents involving B-Affordable’s employees’ personal automobiles when those automobiles were being used in the scope of the employees’ employment. Gooslin filed a claim for damages against Mira and B-Affordable on the theories of negligence and respondeat superior, respectively.
State Auto intervened as a defendant in Gooslin’s action and filed a motion for a judgment declaring that it was not obligated to provide insurance coverage for B-Affordable. State Auto then moved for a summary judgment on the ground that the insurance policy B-Affordable believed insured its employees’ personal automobiles identified the named insured as “Mike Weber & Bill Mira DBA Affordable Tree Service.”[3] After considering B-Affordable’s motion and supporting materials, the trial court determined that the insurance policy did insure B-Affordable and, thus, denied State Auto’s summary-judgment motion. Following a bench trial, State *900 Auto’s claim for declaratory relief was denied, and insurance coverage for B-Affordable was established.
On appeal, State Auto argued that the trial court erred in reforming the insurance policy to provide coverage for B-Affordable. Mira argued that the clear intent of the parties was for State Auto to insure the tree-trimming business owned by Mira and Weber and, therefore, that the trial court’s reformation of the contract was proper.
In affirming the trial court’s reformation of the insurance policy on the basis of a mutual mistake, the Court of Appeals of Ohio stated:
“[T]he issue we must address is whether the contract provision in question—that the insured is ‘Mike Weber & Bill Mira DBA Affordable Tree Service’—is clearly and convincingly contrary to the understanding of all the parties. We hold that it is.
“The record in this case provides clear and convincing evidence that the parties understood and intended that State Auto was to insure the tree trimming business owned by Weber and Mira...,
“However, despite the parties’ intention, the insurance contract as written does not provide coverage to the business. The contract specifically identifies ‘Mike Weber & Bill Mira DBA Affordable Tree Service’ as the insured. Yet, all the parties agree that no such business entity has ever existed. It follows then that the contract did not provide coverage to the non-existent business. Consequently, both parties mistakenly believed that, under the insurance contract, Weber and Mira’s tree trimming business was insured by State Auto. Because a mutual mistake as to a material fact exists, reformation is appropriate to bring the contract into conformity with the parties’ intent. Here, the parties intended to insure a tree trimming business owned by Weber and Mira, and B~ Affordable is the only tree trimming business those two ever owned. Accordingly, the trial court did not err when it reformed the contract to name B-Affordable as the insured. See Justarr Corp. d.b.a. The Terrace at Westside v. Buckeye Union Ins. Co. (1995), 102 Ohio App.3d 222, 656 N.E.2d 1345 (reformation appropriate where evidence supported a finding of mutual mistake of fact as to whether coverage was intended for a corporation that was not a named insured).”
Gooslin, at ¶ 13, ¶ 14, and ¶ 15.
Similarly, the issue in this case is whether the contract provision in question—naming the insured as “Harmar, Inc.”—is clearly and convincingly contrary to the understanding of the parties. Like the Court of Appeals of Ohio in Gooslin, we conclude that it is. The undisputed evidence in this case indicates that Scottsdale and Har-Mar Collisions intended for the Scottsdale policy to insure the auto shop, regardless of under what name the auto shop is incorporated. However, the Scottsdale policy does not reflect that intent because it lists Harmar, Inc., as the corporate entity being insured, a corporation Scottsdale concedes has not and does not exist. As the trial court noted when it reformed the Scottsdale policy, there is no evidence indicating that Scottsdale intended to provide insurance coverage for a nonexistent corporation, and certainly Wayne did not intend to pay premiums on the Scottsdale policy with the understanding that only a nonexistent corporation would ever be able to make a claim for coverage under the policy.
Further, we are unpersuaded by Scottsdale’s argument that there was no mutual mistake because, Scottsdale says, it did not make a mistake. In support of that argu *901 ment, Scottsdale contends that the only mistake resulting in Harmar, Inc., being named the insured in the Scottsdale policy was the mistake in the application for insurance provided by Kahalley and, thus, that reformation of the policy on the basis of a mutual mistake was improper. State Auto made the same argument in Gooslin, and the Court of Appeals of Ohio found it unpersuasive.
“[I]n the context of contracts, mistake means ‘a belief that is not in accord with the facts.’ Restatement of the Law 2d, Contracts (1981) 383, Mistake Defined, Section 151. Here, the belief is that the insurance contract as written provided coverage to the tree trimming business owned by Weber and Mira. The facts, on the other hand, indicate the opposite. Thus, even if there was a unilateral error on the part of Weber and Mira for filing an application with the wrong business name, mutual mistake still exists, and reformation is appropriate.”
Gooslin, at ¶ 17.
We find the well reasoned analysis of the Court of Appeals of Ohio persuasive. As noted above, both Scottsdale and Har-Mar Collisions, at the time Wayne purchased the Scottsdale policy, believed that the Scottsdale policy as written insured the auto shop. However, neither party’s belief was “ ‘in accord with the facts,’ ” id., because the Scottsdale policy, in its original form, insured Harmar, Inc., a nonexistent corporation. As the Court of Appeals of Ohio noted, a mutual mistake may be “ ‘a belief that is not in accord with the facts,’” id. (emphasis added), or, as this Court has defined it, a mutual misunderstanding of the parties that affects a basic assumption on which the contract was made. EBSCO, supra.
In this case, there is clear and convincing evidence in the record showing that Scottsdale and Har-Mar Collisions intended for the Scottsdale policy to insure the auto shop and that the parties had a mutual misunderstanding that the policy as written did so. Accordingly, we affirm the trial court’s judgment insofar as it reformed the Scottsdale policy to reflect that Har-Mar Collisions was the named insured in the policy based on its finding of a mutual mistake.[4]
Scottsdale’s “standing” argument is based on the assumption that the trial court erred in reforming the Scottsdale policy. Because we find no error in the trial court’s reformation of the policy, Scottsdale’s “standing” argument is moot. Accordingly, insofar as it found Scottsdale liable on the breach-of-contract claim, the trial court’s judgment is affirmed.

Case No. 1H.1230

Har-Mar Collisions first argues that the trial court erred in applying the amounts recovered from Har-Mar Collisions’ settlement agreements with Auto-Owners and CRC against the jury verdict *902 of $101,054.40, thus negating the jury verdict and leaving Har-Mar Collisions with no recovery. Whether Scottsdale is entitled to a setoff is a legal question and thus is reviewed de novo by this Court. Nationwide Mut. Fire Ins. Co. v. Austin, 34 So.3d 1238, 1243 (Ala.2009).
Har-Mar Collisions cites Alabama Farm Bureau Mutual Casualty Insurance Co. v. Williams, 530 So.2d 1371 (Ala.1988), in support of its argument that, when an insured enters into a settlement agreement with one of its insurers, the nonset-tling insurer is not entitled to a setoff if the two insurers “owe separate and distinct contractual obligations” to the insured. Har-Mar Collisions’ brief, at 17.
In Williams, the Williamses obtained a fire-insurance policy in March 1981 from Alabama Farm Bureau Mutual Casualty Insurance Company (“Farm Bureau”) on a house they owned and had financed with First Federal Savings and Loan Association of Jasper (“First Federal”). The Williamses paid the policy premiums to First Federal at the rate of l/12th of the annual premium per month, and First Federal in turn paid the premiums on the policy to Farm Bureau.
Sometime between December 1982 and March 1983, problems arose with the coverage on the Williamses’ house. In February 1983, Jimmy Holderfield, a Farm Bureau agent, instructed First Federal to discontinue premium payments until notified otherwise. Unaware of that instruction, the Williamses continued to pay the monthly premium payments to First Federal, despite the fact that First Federal was no longer making the premium payments to Farm Bureau.
In December 1983, the Williamses’ house burned. The Williamses filed a claim with Farm Bureau, but Farm Bureau denied the claim because the premiums on the policy had not been paid and because the policy had not been renewed. The Williamses filed an action against Farm Bureau, Holderfield, and First Federal. Before trial, however, the Williamses entered into a “pro tanto settlement agreement and release” with First Federal for $46,337.06, the remaining mortgage indebtedness on the Williamses’ house. 530 So.2d at 1373.
The Williamses continued to trial on their claims against Farm Bureau and Holderfield, and a jury returned a verdict in the Williamses’ favor in the amount of $74,800, plus interest. Farm Bureau, in an effort to mitigate its liability, made an offer of proof to the trial court of the Williamses’ settlement agreement with First Federal. The trial court denied the offer of proof and entered a judgment in accordance with the jury verdict.
On appeal, Farm Bureau argued that it was entitled to offset its liability by the amount of the settlement agreement between the Williamses and First Federal because, Farm Bureau reasoned:
“[T]he liability and obligations of First Federal and [Farm Bureau] are joint and, therefore, because the plaintiffs suffered only one injury, that it should be allowed to produce as evidence the fact of the partial satisfaction to mitigate or reduce the damages for which it ultimately may be found liable, just as in the case of joint tort-feasors.”
530 So,2d at 1373.
The Williamses, on the other hand, argued that the obligations of First Federal and Farm Bureau to the Williamses were “separate and distinct,” 530 So,2d at 1373, and, thus, that evidence of the settlement agreement was properly excluded. This Court agreed with the Williamses, holding:
“We are of the opinion that appellant’s joint liability theory must fail for the simple reason that there is no evidence *903 that appellant and First Federal either undertook or assumed any joint obligation toward the Williamses. We agree with the Williamses that the obligations owing them from Farm Bureau and First Federal are separate and distinct. The evidence shows that Farm Bureau contracted with the Williamses to provide fire insurance on their house. On the other hand, the only obligation assumed by First Federal was to act as an escrow agent for the Williamses for the payment of the insurance premiums on their home.”
530 So.2d at 1373.
From Williams, it is evident that the relevant inquiry as to whether Scottsdale is entitled to a setoff is whether the obligations Scottsdale owed Har-Mar Collisions under the Scottsdale policy are “separate and distinct” from the obligations Auto-Owners and CRC owed Har-Mar Collisions.
As to Auto-Owners’ obligations to Har-Mar Collisions, the evidence at trial unequivocally shows that the Auto-Owners policy provided insurance coverage for Har-Mar Collisions’ liabilities. The Scottsdale policy, on the other hand, provided insurance coverage for the commercial property itself. Thus, the evidence does not support a conclusion that Scottsdale and Auto-Owners “undertook or assumed any joint obligation toward [Har-Mar Collisions].” Williams, 530 So.2d at 1373. See Employers Nat’l Ins. Co. v. Holliman, 287 Ala. 123, 128, 248 So.2d 717, 721 (1971) (“‘“The character of liability insurance is quite different from insurance against damage to, or loss of, the property insured, where the insured is required to have some real interest in the property insured; in the case of liability insurance the risk and hazard insured against is not the damage to, or loss of, the property named in the policy, but against loss and injury caused by the use of the property therein named, for which the insured might be liable(quoting Bendall v. Home Indemnity Co., 286 Ala. 146, 151, 238 So.2d 177, 181 (1970), quoting in turn Blashfield Automobile Law and Practice § 291.4 (3d ed.) (emphasis omitted))).[5]
We are unpersuaded by Scottsdale’s argument that Har-Mar Collisions, by entering into the Scottsdale policy, agreed to the setoff pursuant to the following policy provision:
“G. OTHER INSURANCE
[[Image here]]
“2. If there is other insurance covering the same loss or damage, ... we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect oil it or not.”
(Capitalization in original; emphasis added.) That subsection provides that Scottsdale’s obligation to Har-Mar Collisions might be limited if other insurance covering the same loss or damage exists. As noted above, there is no evidence in this case indicating that the Auto-Owners poli *904 cy covers loss or damage to the auto shop. Rather, as we have already noted, the evidence indicates that the insurance coverage provided in the Auto-Owners policy was for Har-Mar Collisions’ liabilities arising from its operation of the auto shop. Thus, Scottsdale’s argument that the money Auto-Owners paid Har-Mar Collisions pursuant to the settlement agreement “was intended to address loss/damage to the property at issue,” Scottsdale’s brief, at 23, is unsupported by the evidence.
We are also unpersuaded by Scottsdale’s argument that the setoff was proper because, Scottsdale says, “[t]he claims against Scottsdale ... and Auto-Owners were based on the same allegations of non-payment under policies providing coverage to the same property for the same types of loss.” Scottsdale’s brief, at 24. As noted above, the Scottsdale policy and the Auto-Owners policy did not provide coverage for the same types of loss. Furthermore, it is not the nature of the claims and allegations against separate insurers that determines whether a setoff is applicable; rather, it is the nature of the obligations to the insured undertaken by the separate insurers. Williams, 530 So.2d at 1373 (stating that Farm Bureau’s argument “must fail for the simple reason that there is no evidence that [Farm Bureau] and First Federal either undertook or assumed any joint obligation toward the Williamses” (emphasis added)).
Scottsdale also argues that the setoff was proper because, Scottsdale says, Har-Mar Collisions suffered only one injury, i.e., the loss by fire of the auto shop. However, this Court expressly rejected that same argument in Williams, stating: “Furthermore, we do not accept [Farm Bureau’s] argument that if the breach of different contractual obligations produces only one injury then evidence of a pro tanto settlement agreement should be allowed into evidence.” Williams, 530 So.2d at 1373. We reiterate that the dispositive question in determining whether a setoff is applicable under these circumstances is not whether the insured has suffered a single injury but whether the insurers undertook a joint obligation as to the insured.
As to CRC’s obligation, we note that CRC did not assume any obligation to provide Har-Mar Collisions with insurance coverage for either the auto shop or for Har-Mar Collisions’ liabilities. CRC’s sole obligation was to procure insurance for Har-Mar Collisions. The obligation to procure insurance on behalf of an insured is not the same obligation as the duty to provide coverage once insurance has been procured. Accordingly, CRC did not undertake with Scottsdale a joint obligation as to Har-Mar Collisions.
The applicability of a setoff arising from a settlement agreement is an affirmative defense. Morris v. Laster, 821 So.2d 923, 930 (Ala.2001). Therefore, the party offering the defense—in this case, Scottsdale—carries the burden of proof. Ex parte Rogers, 68 So.3d 773, 780 (Ala. 2010). There is no evidence in this case to indicate that either Auto-Owners or CRC undertook a joint obligation with Scottsdale as to Har-Mar Collisions. Thus, Scottsdale did not meet its burden of proof. Accordingly, the trial court’s application of the settlement agreements against the jury verdict was error. On remand, the trial court should enter a judgment reinstating the jury verdict of $101,054.40 in favor of Har-Mar Collisions.[6]
*905 Har-Mar Collisions argues that the trial court erred in denying its prejudgment motion to add, pursuant to § 8-8-8, Ala. Code 1975, interest to the jury verdict of $101,054.40.[7] The parties agree that the dispositive question in determining whether prejudgment interest should be awarded in a breach-of-contract action is whether the “damages were reasonably certain at the time of the breach.” Goolesby v. Koch Farms, LLC, 955 So.2d 422, 429 (Ala.2006). However, Har-Mar Collisions has not argued or directed this Court’s attention to any evidence indicating that the damages it sought were “reasonably certain at the time of [Scottsdale’s] breach.” Id. Rather, in a one-paragraph argument, Har-Mar Collisions states that the date of Scottsdale’s breach was June 11, 2011, and that 6% interest calculated from June 11, 2011, to May 7, 2015, equates to $23,702.47.[8] That argument is insufficient for this Court to reverse the trial court’s decision refusing to award prejudgment interest when Har-Mar Collisions has failed to provide this Court with any indication that the trial court had before it any evidence that the damages at the time Har-Mar Collisions alleges Scottsdale breached the contract were reasonably certain. Accordingly, we affirm the judgment insofar as it denies prejudgment interest on the jury verdict.
Lastly, Har-Mar Collisions argues that the trial court erred in failing to tax costs against Scottsdale. Pursuant to Rule 54(d), Ala. R. Civ. P., a trial court has discretion in determining whether to award costs to the prevailing party. Classroomdirect.com, LLC v. Draphix, LLC, 992 So.2d 692, 713 (Ala.2008). Because, as a result of the setoff, Har-Mar Collisions did not recover damages from Scottsdale despite the fact that a judgment was entered in Har-Mar Collisions’ favor as to its breach-of-contract claim, Har-Mar Collisions was not the prevailing par *906 ty at trial. See Alabama State Univ. v. Danley, 212 So.3d 112, 142 (Ala.2016) (noting that the Supreme Court of the United States has held that “ ‘[rjespect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail’ ” (quoting Hewitt v. Helms, 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987))). However, because we are reversing the judgment insofar as it applied a setoff against the jury verdict, the trial court’s judgment entered on remand will award Har-Mar Collisions damages, and, consequently, Har-Mar Collisions will be the prevailing party as to its breach-of-contract claim against Scottsdale. Accordingly, on remand the trial court should reconsider Har-Mar Collisions’ motion to tax costs in light of the fact that Har-Mar Collisions will then be the prevailing party.[9]

Conclusion

As to case no. 1141230, we reverse the judgment to the extent it applied a setoff against the jury verdict returned against Scottsdale and remand the case for the trial court to enter a judgment reinstating the jury verdict of $101,054.40. On remand, the trial court should also reconsider Har-Mar Collisions’ motion to tax costs. As to the remainder of case no. 1141230, the judgment is affirmed. As to case no. 1141267, the judgment is affirmed.
1141230—AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
STUART, PARKER, SHAW, MAIN, and WISE, JJ., concur.
BOLIN, J., concurs in the result.
MURDOCK, J., dissents.
1141267—AFFIRMED.
STUART, BOLIN, PARKER, SHAW, MAIN, and WISE, JJ., concur.
MURDOCK, J., concurs in the result.

. Owners Insurance Co., a subsidiary of Auto-Owners Insurance Co., provided the garage-liability coverage for Har-Mar Collisions, and Auto-Owners Insurance Co. provided the commercial umbrella-liability coverage. For simplicity, and because the separate identities of Owners Insurance Co. and Auto-Owners Insurance Co. are not relevant to the issues on appeal, we collectively refer to the policy providing garage-liability coverage and the policy providing commercial umbrella-liability coverage as "the Auto-Owners policy.”

. We recognize that Gooslin, an unpublished decision of the Court of Appeals of Ohio, carries no precedential value in this jurisdiction. However, the unpublished status of Gooslin does not affect its precedential value in Ohio. See Rule 3.4, Ohio Supreme Court Rules for the Reporting of Opinions. Furthermore, this Court, in Ex parte Miltope Corp., 823 So.2d 640 (Ala.2001), stated the following after relying on an unpublished decision from the Court of Appeals of Ohio:
“Pearce's unpublished status ... does not preclude us from using it in our analysis. No opinion from another state court is binding on the courts of Alabama, but we often cite such an opinion as persuasive authority. We cite Pearce because it is a well-reasoned opinion that addresses the precise issue before us.”
823 So,2d at 645 n. 5.

. Weber was the other 50% shareholder of B-Affordable.

. Scottsdale argues in its reply brief that, assuming reformation of the Scottsdale policy was proper, the trial court nevertheless erred in reforming the contract because, Scottsdale says, the parties’ intent at formation of the contract was for Scottsdale to insure the interest of the owner of the auto shop. Because it is undisputed that Hartung owned the auto shop, Scottsdale argues that a proper reformation of the policy would require Hartung, not Har-Mar Collisions, to be substituted as the named insured and that the substitution of Har-Mar Collisions "transformed the [pjolicy into a contract contrary to the intent of the parties.” Scottsdale’s reply brief, at 14 (emphasis in original). However, Scottsdale did not raise that argument in its initial brief to this Court, and it is well settled that this Court will not address arguments raised for the first time in an appellant’s reply brief. Walden v. Hutchinson, 987 So.2d 1109, 1121 (Ala.2007). Accordingly, we do not address that argument.

. An example illustrates the point. Given the respective coverages provided in the Scottsdale policy and the Auto-Owners policy, in a scenario where the auto shop was damaged in a manner that did not give rise to any liability on the part of Har-Mar Collisions, the Scottsdale policy would provide coverage for that damage (assuming no applicable policy exclusion), in spite of the fact that damage to the auto shop alone would not trigger coverage under the Auto-Owners policy. Conversely, in a scenario where Har-Mar Collisions incurred some liability during the course of its business operations, but the auto shop did not sustain any damage, the Auto-Owners policy would provide coverage for that liability (assuming no applicable policy exclusion), in spite of the fact that the liability would not trigger coverage under the Scottsdale policy.

. Har-Mar Collisions argues that the trial court erred in excluding evidence of the replacement costs of the auto shop. On May 4, 2015, before the commencement of the trial, the trial court and the parties’ attorneys addressed a motion in limine filed by Scottsdale *905 to exclude evidence of the replacement costs of the auto shop and to limit the evidence to the actual cash value of the auto shop. Scottsdale argued that the policy did not provide coverage for replacement costs until Har-Mar Collisions repaired or replaced the auto shop and offered Hilley v. Allstate Insurance Co., 562 So.2d 184 (Ala.1990), in support of its argument. There is no indication in the record that the attorney for Har-Mar Collisions ever provided the trial court with an argument that Scottsdale’s interpretation of Hilley was incorrect or that Har-Mar Collisions was entitled to replacement costs.
On appeal, Har-Mar Collisions argues that "Hilley is completely contrary to the longstanding concept of anticipatory repudiation” and that Hilley "invites more insurance companies to deny claims.” Har-Mar Collisions’ brief, at 23-24. However, although Har-Mar Collisions had multiple opportunities before trial, at trial, and after trial to argue that Scottsdale’s attorney had misinterpreted Hil-ley or that Hilley was otherwise inapplicable to the circumstances of this case, it failed to do so. Thus, because there is no indication in the record that Har-Mar Collisions ever raised this argument to the trial court, the issue has not been preserved for appellate review.

. Section 8-8-8 provides:
"All contracts, express or implied, for the payment of money, or other thing, or for the performance of any act or duty bear interest from the day such money, or thing, estimating it at its money value, should have been paid, or such act, estimating the compensation therefor in money, performed.”

. The Scottsdale policy provides that payment for covered loss or damage will be made within 30 days after Scottsdale receives a sworn proof-of-loss form from the insured. Har-Mar Collisions contends in its brief to this Court that it provided Scottsdale with a sworn proof-of-loss form on May 11, 2011, which, Har-Mar Collisions argues, means that Scottsdale breached the contract when it failed to provide payment on or before June 10, 2011. The record on appeal, however, appears to indicate that Scottsdale received the sworn proof-of-loss form on May 5, 2011,

. The decision to tax costs rests with the trial court. We are merely giving the trial court the opportunity to award costs in light of the fact that Har-Mar Collisions has prevailed on its breach-of-contract claim.